UNITED STATES of America,

v.

Jorge L. PABON–CRUZ, Defendant.

No. 01 CR. 1187(GEL).

United States District Court,
S.D. New York.

Feb. 4, 2003.

Alexander H. Southwell, Assistant United States Attorney, New York, New York (James B. Comey, United States Attorney for the Southern District of New York, of counsel), for U.S.

Jennifer Brown, New York, New York, for defendant Jorge L. Pabon–Cruz.

*OPINION AND ORDER*

LYNCH, District Judge.

On October 16, 2002, a jury returned a guilty verdict on both counts of an Indictment charging Jorge L. Pabon Cruz ("Pabon") with advertising to receive, exchange, or distribute child pornography in violation of 18 U.S.C. § 2251(c)(1)(A) ("Count One") and receiving or distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B) ("Count Two"). The defense now moves for a judgment of acquittal on both counts pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or alternatively for a new trial pursuant to Rule 33. The defense claims that (1) the evidence was insufficient to prove that Pabon knew that the images depicted actual children; and (2) a new trial is required because (a) the admission of the pornographic photographs was unfairly prejudicial; and (b) the Court's supplemental instruction was so confusing as to result in an improper verdict. (Defendant's Memorandum of Law ("Def.'s Mem.") at 1.) The motion will be denied.

*DISCUSSION*

I. *Sufficiency of the Evidence*

■ Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the Court may set aside a jury's verdict and enter a judgment of acquittal if the evidence is insufficient to sustain a conviction. A defendant claiming that the evidence against him was insufficient bears a very heavy burden. *United States v. Desena,* 287 F.3d 170, 177 (2d Cir.2002). Not only must the Court "view the evidence presented in the light most favorable to the government ... draw[ing] all reasonable inferences in [the government's] favor," but the Court also "must uphold the jury's verdict if [it] find[s] that '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).) These standards are designed to prevent the Court from "usurping the role of the jury" by "substitut[ing][its] own determinations of credibility or relative weight of the evidence for that of the jury." *Id.* (internal quotation omitted).

Pabon argues that the evidence was insufficient to prove that he knew that the photographs contained images of actual children and that such knowledge was a required element of Counts One and Two. Since the evidence, construed in the light most favorable to the government, was sufficient to support a reasonable inference that Pabon had the requisite knowledge to violate each statute, the motion for acquittal will be denied.

A. *Count Two: Knowingly Receiving or Distributing Child Pornography*

■ Count Two of the indictment charges Pabon with violating 18 U.S.C. § 2252A(a)(2)(B), which provides for criminal punishment of any person who "knowingly receives or distributes ... any material that contains child pornography that has been ... transported in interstate or foreign commerce by any means, including

by computer." As relevant to this case "child pornography" is defined as a "visual depiction" whose production "involve[d] the use of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(A).[1] A defendant may only be convicted of violating this statute, then, if he "knowingly" receives or distributes visual images that were produced using actual minors.

Neither the Supreme Court nor the Second Circuit has addressed whether, in this particular version of the various confusing and overlapping federal statutes dealing with child pornography, the term "knowingly" modifies only the verbs "receives or distributes" or extends to the entire phrase "knowingly receives or distributes ... child pornography," such that the government must prove that the defendant was aware that the material he was receiving or distributing was child pornography as defined by the statute, that is, that it had been produced using real children rather than virtual images. However, in *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), the Supreme Court addressed essentially the same question in connection with 18 U.S.C. § 2252(a)(1)(A), which punishes anyone who "knowingly transports or ships in interstate or foreign commerce ... any visual depiction, if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct." The Court concluded that the term "knowingly" extended to the "use of a minor" element. 513 U.S. at 78. The Supreme Court's interpretation makes excellent sense, since it is rarely reasonable to impose criminal punishment on people who are unaware of the critical facts that make their conduct blameworthy. What makes the conduct punished by § 2252(a)(1)(A) blameworthy is that it involves trafficking in depictions of the sexual abuse of children; the "interstate commerce" element is merely what brings the blameworthy conduct under federal jurisdiction. To hold that "knowingly" applied only to the act of "transporting in interstate commerce" would irrationally *deny* a defense to someone who knowingly mailed a package without knowing that it contained child pornography, while *providing* a defense to someone who intended to distribute materials that he knew constituted child pornography, but inadvertently put it on the outgoing mail pile rather than on the one for hand delivery.[2]

Section 2252A(a)(2)(B), the statute at issue in this case, simply extends the jurisdictional reach of the criminal penalties provided in § 2252(a)(1) for those who actually transport child pornography in interstate commerce to those who receive or distribute child pornography that has previously been so transported. There is no persuasive reason to interpret it differently than the virtually identical provision interpreted in *X–Citement Video*. As this Court held in *United States v. Reilly*, No. 01 Cr. 1114(RPP), 2002 WL 31307170, at *5 (S.D.N.Y. Oct. 15, 2002):

1. Additional definitions encompassing sexual images that appear to be or are marketed as involving minors, but that in fact are produced by such means as computer simulation or the use of adult actors who appear youthful, 18 U.S.C. §§ 2256(8)(B) and 2256(8)(D), have been declared unconstitutional. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). Yet another category of material, involving images that create the appearance of identifiable minors, 18 U.S.C. § 2256(8)(C), is not involved in this case.

2. A statute that punished the mailing of material that the defendant knew contained sexually explicit images when the material actually had been made using children (even if the defendant did not know that) would not be as irrational. However, as the *X–Citement Video* Court pointed out, the words of 18 U.S.C. § 2252(a) cannot be tortured to yield this meaning. 513 U.S. at 77–78, 115 S.Ct. 464.

[§ 2252A] is of the same grammatical structuring, carries the same harsh penalties, and uses the same definitional section as 18 U.S.C. § 2252. As such, the same penalties and anomalies which concerned the *X–Citement* Court would result if this Court were to construe 'knowingly' in § 2252A as modifying only the surrounding verbs and not the minority of the performers and the sexually explicit nature of the material which the *X–Citement* Court held applicable to § 2252.

For these reasons, the Court instructed the jury, without objection from either the government or the defendant, that to convict Pabon of Count Two, the Government must prove that he "knew that the child pornography depicted at least one minor, that is, an actual person under the age of eighteen, and knew the general nature, character, and content of the child pornography." (Trial Transcript ("Tr.") 444.) The jury, which is presumed to have followed this instruction, found the defendant guilty beyond a reasonable doubt.

The evidence was sufficient to permit the jury to make this finding. First, it is undisputed that the material at issue in this case *was* in fact created using actual minors, and was not virtual, artificial, simulated or falsified child pornography masquerading as the real thing. The defense stipulated that various photographs in evidence recovered from Pabon's file server "depict actual children. In other words, [the photographs] are not digital or virtual creations and are not computer generated images." (Gov't Exhibit ("GX") 5.) This stipulation was read to the jury near the end of the prosecution's case. (Tr. 241–42.)

■ Pabon correctly points out that (1) the stipulation does not address his *knowledge* of whether the images depict actual

children; and (2) the government did not present *direct* evidence that Pabon knew that the material was not simulated or virtual child pornography. (Def.'s Mem. at 2.) But direct proof of knowledge is not required for conviction. Proof beyond a reasonable doubt may be made out by circumstantial evidence. Indeed, as courts routinely instruct juries, since direct access to the contents of a person's mind is rarely available, knowledge is usually proved in criminal cases in precisely that way. To set aside the jury's verdict, the Court must conclude that no rational factfinder could have inferred from the evidence, considered in the light most favorable to the government, that Pabon knew that the images depicted actual children.

■ In addition to the stipulation, the record includes testimony and documentation concerning the quantity, nature, and organization of the child pornography in Pabon's possession. The defendant's computer contained over 500 photographic files and over 200 video files of child pornography. (Tr. 182–83.) A jury exercising common sense could easily infer that no rational person could believe that all of these images were simulated or virtual. The material was neatly organized into categories, thus indicating that the proprietor of the site was familiar with the files it contained. We will not recite a long list of the titles of the files; the name of one file downloaded by an undercover officer, which is not atypical of the names of files in the computer, will suffice to give the flavors "5YROLD–LINDA_FUCKSDICK-DEEP-IN-PUSS.jpg." (Tr. 154; GX 3G.) [3] The exhibit showed that the title was a fair description of the contents of the file. From this evidence, "any rational trier of fact" could easily have concluded that Pabon had personally examined and indexed a great deal of the material on his comput-

---

**3.** The suffix "jpg" indicates that the file consists of a photographic image. (Tr. 116.)

er, and thus was aware of the images it contained.

The jury also viewed what it was entitled to conclude was a representative sample of that material. Certainly nothing about these shocking images would suggest in any way to the reasonable observer that the images did not depict actual children. To the contrary, the images appear sickeningly real. The children shown in many of the photographs in evidence are so young that no reasonable person could entertain the possibility that they were actually youthful-looking adults. While advances in digital imaging technology have arguably made it possible to "fake" human images by creating convincing digital simulations, jurors could draw on their own common sense and experience to recall that the most expensive digital special effects Hollywood can command only rarely generate images that can be confused with live human actors. No reasonable person could have believed that more than a handful of the thousands of photographs and videos that the evidence shows Pabon had collected and distributed could possibly have been produced using such techniques.

Moreover, internal evidence in many of the photographs suggests that they depict actual incidents of abuse. Some of them mask identifying features of the children or adults depicted, permitting the inference that the events depicted were actual abusers concerned lest they be identified

and prosecuted for their criminal acts. Others can be inferred from objects depicted in them to have been created some time ago, before the development of digital technology. The same internal evidence from which the jury could conclude beyond a reasonable doubt, even absent stipulation, that actual children were depicted in the images at issue was unquestionably available to Pabon, and the jury thus could easily have concluded that what they knew beyond a reasonable doubt, he knew to the same degree of certainty.

Nothing more is required by the statutory element of knowledge. Pabon could have argued to the jury (although, in fact, he did not) that the evidence left open the possibility that he believed all the apparent child pornography in his possession had been produced in a virtual reality workshop.[4] But the jury would have been fully entitled to reject any such argument. The argument that it is theoretically possible that every image Pabon received and distributed had been simulated, and that unless he had been present for their production (and there is no evidence he ever was involved in producing any pornography of any kind) Pabon could not have actually "known" that they were real, demands an epistemological certainty that the law has never required. Drug couriers are convicted every day of "knowingly" distributing illegal drugs that they had never field-tested or personally sampled, and which theoretically could have been counterfeit.

**4.** Pabon's attorney did *not* argue in summation that the photographs were virtual or that they could be virtual or that Pabon could have believed they were virtual. To the contrary, she told the jury that "The pictures are simply not in dispute. You heard a stipulation yesterday, agreement, no questions from me, agreement, they are child pornography." (Tr. 384.) The gist of her closing was that Pabon was not in the business of child pornography and was a good kid who had made a "bad mistake" in that he "got in a chat room with an ugly name and sent and traded ugly pictures with other people." (Tr. 379.) To the extent the defense made any factual argument at all, it was that the government hadn't proved beyond a reasonable doubt that Pabon himself had posted the advertisement; that Pabon was of good character; that the computer program could run without Pabon's being present; and that it was possible that the operation of Pabon's computer could have been compromised by a virus.

In those cases, it is enough for the factfinder to conclude that the defendant believed that the package contained real narcotics, and that the circumstances were such that the defendant's belief was well supported and turned out to be accurate.

As Judge Learned Hand once said in connection with receiving stolen property,

The receivers of stolen goods almost never "know" that [the goods] have been stolen, in the sense that they could testify to it in a court room. The business could not be so conducted.... [T]hat the jury must find that the receiver did more than infer the theft from the circumstances has never been demanded, so far as we know; and to demand more would emasculate the statute, for the evil against which it is directed is exactly that: i.e., making a market for stolen goods which the purchaser believes to have probably been stolen.

*United States v. Werner,* 160 F.2d 438, 441–42 (2d Cir.1947). It is not enough, as Judge Hand also states, that a reasonable person in the defendant's shoes *should* have known the facts, for that would create liability for mere negligence. The jury must find that the defendant *did* reach the conclusion from the evidence available to his senses—"although of course the fact that a reasonable man would have thought that they had been stolen, is some basis for finding that the accused actually did think so." *Id.* In this case, the jury had no reason whatsoever to think that Pabon might have believed anything other than what a reasonable person would have believed from the evidence before him.[5]

Finally, the advertisements posted by Pabon further support the inference that he was fully aware that the material he was distributing was actual child pornography. For example, in an internet chat room devoted to "preteenrapesex," Pabon advertised that a visitor to his file server could download pictures including "Preteen (black/asian/redheads/cumshots)." (GX 18A.) Nothing in the advertisement indicates that Pabon was seeking or offering simulated or virtual material, and the reference to pictures of different types of "[p]reteen[s]" and to "cumshots" (photographs featuring ejaculation) could reasonably be inferred by the jury to refer to depictions of actual persons and actual events.

The jury's rational inference that Pabon knew that he was distributing images of actual children was sufficiently supported by the stipulation and other evidence presented at trial and cannot be set aside.

### B. Count One: Advertising to Receive or Distribute Child Pornography

Count One charged Pabon with violating yet another variant of the child pornography laws, 18 U.S.C. § 2251(d)(1)(A), which punishes anyone who "knowingly makes, prints, or publishes ... any notice or ad-

---

5. Pabon relies on *Reilly* for the proposition that proving that the images depict actual children is insufficient to prove that the defendant knew that they did. (Def.'s Mem. at 2.) That reliance is misplaced. In *Reilly,* the Court permitted a defendant to withdraw his guilty plea to violating § 2252A because the defendant had not been advised that knowledge that the depictions involved children was an element of the offense; the Court did not define "child pornography" during the plea proceeding; and the defendant's allocution did not acknowledge that he knew that the images were of actual children. The government's only proffer at the time of the plea had been that it could prove that some of the images depicted actual children. 2002 WL 31307170, at *3. The Court thus did not address the type of proof that would permit a jury to find knowledge. Rather, the Court only held that Reilly had not knowingly and voluntarily pled guilty and was thus entitled to withdraw his plea. Pabon, in contrast, was tried before a properly-instructed jury that found that he did have the requisite knowledge.

vertisement seeking or offering ... to receive, exchange, buy, produce, display, distribute, or reproduce any visual depiction ... [the production of which] involves the use of a minor engaging in sexually explicit conduct and [which depicts] such conduct" (provided certain jurisdictional elements involving interstate commerce are satisfied). Pabon argues again that the evidence was insufficient to prove that he knew that the visual depictions involved were of actual minors.

As explained above, the jury's finding that Pabon did know that the pornographic images he was receiving and distributing were of actual children was amply supported by the trial evidence. Thus, even were this knowledge an element of Count One, as it unquestionably is of Count Two, there would be no reason to disturb the jury's verdict.

With respect to Count One, however, the government contends that it was not required to prove that Pabon knew that the visual depictions advertised were of actual children. The point is well-taken, since § 2251(d)(1)(A) is rationally distinguishable from § 2252A(a)(2)(B) (the statute at issue in Count Two) or § 2252(a)(1) (the statute at issue in *X–Citement Video*) in terms of the conduct it prohibits, its purposes, its language, and its explicit legislative history.[6] It cannot simply be assumed, without a careful analysis, that the requirement of "knowledge that the de-

pictions were of actual minors" caries over from one statute to the other.

First, § 2251(c) deals with advertising. The core prohibited conduct is posting a "notice or advertisement" seeking or offering to take certain actions with respect to depictions of minors engaged in sexually explicit activity. Nothing in the statute requires that the advertisement relate to any particular, already-existing photographs at all. Unlike the conduct prohibited by § 2252A(a)(2)(B), which involves the actual distribution or receipt of materials that necessarily already exist, and the nature of which can thus be known, the conduct at issue in § 2251(d)(1)(A) involves merely the public statement of one's willingness to be involved with child pornography in the specified ways. Many of the prohibited actions involve indicating that one is receptive to dealing with pornographic images that the actor has not yet seen, or which may not yet even exist. For example, one who knowingly publishes an advertisement offering to buy child pornography violates the statute. To say that someone posting such an advertisement must "know" that the images involve actual children makes no sense. Indeed, there need not be any specific images in the case at all; the crime is complete when the defendant advertises his willingness to receive the material. The mens rea element of the statute thus logically relates to whether the

---

**6.** It is also, less rationally, distinguishable in terms of penalty. While § 2252A punishes actually distributing (or attempting to distribute) child pornography with a maximum of fifteen years in prison and no mandatory minimum sentence, § 2251(c)(1) requires a mandatory *minimum* punishment of ten years, and permits a sentence of up to twenty years in prison, for the mere act of advertising one's desire to receive such material. Compare 18 U.S.C. § 2252(b)(1) with 18 U.S.C. § 2251(d). Like the overlapping prohibitions and slightly different formulations of these various closely-related statutes, the incongruous penalty structure results from Congress' tendency to close loopholes in the law by enacting entirely new statutes rather than revising or amending old ones. The result is that statutes enacted at different times do not always rationally relate to each other. A complete revision of the entire chapter of Title 18 relating to child sexual exploitation and abuse to simplify and harmonize these various statutes would make their enforcement much easier and more effective.

advertisement seeks or offers actual child pornography, not to the nature of any specific image.

■■■■ Second, the advertising statute bears a different relationship to the purpose of preventing child abuse than does the receipt and distribution statute. The reason for the emphasis on actual minors in these statutes is that they are not obscenity laws. *See Ashcroft v. Free Speech Coalition*, 122 S.Ct. at 1399–1400. Child pornography statutes are permitted to sweep more broadly than traditional obscenity laws, without infringing the First Amendment, because they aim not to suppress offensive speech or images, but to protect children against exploitation. The production of (non-obscene) sexually-oriented images relating to children may not be prohibited, according to *Ashcroft*, if the images are only simulated, because no child is actually harmed. Thus, someone who receives or distributes such simulated images is engaging in constitutionally-protected, if distasteful, conduct, and someone who honestly believes that the material he is receiving or distributing is protected is not engaged in illegal activity.

The situation is different with respect to advertising. Someone who advertises his desire to receive child pornography, at least without affirmatively specifying that he is seeking only simulated depictions, is directly encouraging the production and distribution of material created by abusing children. A recipient or reader of such an advertisement who is willing to respond has no reason to limit himself to providing simulations, and the person posting the advertisement has every reason to know that he is soliciting or encouraging the creation and distribution of actual child pornography. No constitutional constraint requires that someone who posts such an advertisement must be protected unless he subjectively harbors an affirmative preference for depictions of actual child abuse.[7]

Third, these distinctions between the statutes are not theoretical, after-the-fact rationalizations; they are firmly rooted in the language of the statute and the expressed intentions of the legislators who adopted it. Section 2252A(a)(2)(B) prohibits "knowingly ... distribut[ing] ... material that contains child pornography" (in the "actual-child" sense defined by the statute). It requires no stretch of the language to read these words to mean that one must know one is receiving child pornography (as defined) to violate the statute. That is, in fact, the way most people would probably understand it. For example, in ordinary English usage, one does not "knowingly distribute cocaine" if one thought one was passing along a box of soap powder simply because one knew one was engaged in distributing *something*. Section 2251(d)(1)(A), however, prohibits

---

**7.** It could be argued that the case is different with respect to one who advertises offering to *distribute* child pornography, since such a person would likely know what he is offering for sale. This argument is not persuasive, for three reasons. First, it is not really accurate. A person could advertise offering to distribute child pornography without having any particular images in possession or in mind, expecting simply to acquire later whatever material is necessary to meet any orders resulting from the advertisement. Second, receiving and distributing are two among many alternatives in the statute's list of prohibited conduct, and as the Supreme Court said in *X–Citement Vid-* *eo*, "as a matter of grammar it is difficult to conclude that the word 'knowingly' modifies one of the elements ... but not the other." 513 U.S. at 77–78, 115 S.Ct. 464. If the suggested mens rea requirement cannot sensibly be applied to one of the elements, it cannot easily be a requirement for any. Third, in this case, the indictment charges and the evidence demonstrates that Pabon was involved in both receiving and distributing. He did not distribute for money, but rather in exchange for other images. Thus, everything said above about the dangers of advertising to *receive* child pornography fully applies to this case.

"knowingly ... publish[ing][an] advertisement seeking or offering to ... distribute ... any visual depiction, *if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct."* (Emphasis added.) The "knowingly" language is found in a separate sentence clause before the word "if," and is most easily read as modifying only the publishing of an advertisement for visual images, which becomes a crime whenever the images *in fact* involved the use of actual minors in sexual activity.

The language alone is not controlling, however. The formulation in § 2251(c), while sharply different from that in § 2252A(a)(2)(B), is virtually identical to that in § 2252(a)(1), which the Supreme Court in *X–Citement Video* held did require knowledge. However, the *X–Citement* Court recognized that the language of the statute did not favor that interpretation, but was in fact the biggest obstacle to it. It nevertheless overrode the natural reading of the statute, and imported a knowledge element, because of policy considerations and legislative history. As noted above, the policy considerations present in *X–Citement Video* do not apply as strongly to the advertising statute.

Moreover, as the Supreme Court explicitly noted, the legislative history of § 2251(c) is directly contrary to that of § 2252(a). The Court found that the legislative history of § 2252 supported its understanding of the mens rea requirement of that statute. It paused, however, to note that the history of § 2251(c), which was adopted at a different time by a different Congress, was to the contrary. Unlike § 2252, the House Committee Report regarding the addition of § 2251(c) contains a clear statement of the drafter's intent as to scienter, stating that "[t]he government must prove that the defendant knew the character of the visual depictions as depicting a minor engaging in sexually explicit conduct, but need not prove that the defendant actually knew the person depicted was in fact under 18 years of age or that the depictions violated Federal law." House Report 99–910, H.R. Rep. 99–910, reprinted in 1986 U.S.C.C.A.N 5952, 5956, *See* 513 U.S. at 77 & n. 6, 115 S.Ct. 464. The legislative history thus further supports the conclusion that § 2251(c) does not require proof that the defendant knew that the participants depicted in the images advertised were minors.

■ Since Count One does not require proof of the element Pabon claims was insufficiently demonstrated (i.e., knowledge that the images he advertised to receive or distribute depicted actual children), his challenge to the sufficiency of the evidence on that count must fail in any event. Pabon does not challenge here, as he did not challenge at trial, the correctness of the instructions that were given to the jury. The Court's instructions correctly focused not on the nature of the *images* but on the nature of the *advertisement.* The jury was told that the defendant had to "knowingly publish a particular kind of advertisement." "[K]nowingly" was described as meaning "just what you would expect. It means that the defendant knew what he was doing." (Tr. 441.) The Court then described "the kind of notice or advertisement required," specifying three elements: (1) the advertisement has to seek or offer a visual depiction; (2) the visual depiction has to show a minor engaging in sexually explicit conduct; and (3) that depiction "must have been made using a real person, a real minor." (Tr. 441–42.) The jury was thus advised, correctly, that the defendant could not be convicted unless it was proved that he knew that the advertisement he published sought or offered to distribute or exchange pictures of real minors engaging in sexual activities.

For the same reasons discussed above with respect to Count Two, the evidence was amply sufficient to permit a finding beyond a reasonable doubt that Pabon knew that the images that resided in his computer, and that he was advertising to distribute, included many images depicting actual children engaged in sexual activity. Moreover, a reasonable jury could conclude from the very face of the advertisements and the context in which they appeared that their author was knowingly offering and seeking depictions of actual child pornography. For example, in an internet chat room devoted to "preteen-rapesex," Pabon posted an advertisement noting: "Fine stuff here like: Preteen (black/asian/redheads/cumshots)." (GX 18A.) Nothing in the advertisement indicates that Pabon was seeking or offering simulated or virtual material; that the "cumshots" he offered to distribute were faked; or that the "black" or "redhead[ed]" "[p]reteen[s]" depicted were not real "preteens" at all but digital counterfeits. Another ad in a similar chat room ("preteen666") stated that Pabon was "Offering: Preteen (black/asian/redheads/cumshots)" and invited the reader to "enter and find whatever you need (or like)." (GX 15A). The jury could conclude that an advertisement offering "whatever you . . . like" in an internet chat room that the evidence showed was devoted to pedophilia, posted by someone who knew that the file server to which he was offering access contained images of actual children engaged in sexual intercourse with adults and animals, was a knowing violation of the statute.

The evidence was thus ample to permit a reasonable jury to find all of the elements of the offense, including the mental element the statute actually requires (*i.e.*, knowledge that the advertisements posted offer or seek actual child pornography). While § 2251(d)(1)(A) does not require the knowledge element now suggested by the defendant (*i.e.*, knowledge that the images advertised themselves had been produced using actual children), the evidence before the jury, as discussed in connection with Count Two, was sufficient to permit a finding that Pabon did indeed know that children were used in the production of the images he advertised to receive and distribute.

## II. *Motion for a New Trial*

Although the Court has more discretion when considering whether to grant new trials pursuant to Rule 33 of the Federal Rules of Criminal Procedure "if the interests of justice so require," the burden on defendants seeking that relief is still substantial since the Court exercises its discretion " 'sparingly' " and only in " 'the most extraordinary circumstances' " where "letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir.2001) (citing *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992)). While the Court need not view the evidence in the light most favorable to the government as it must on a Rule 29 motion, "courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility," intruding on the jury's role only in "exceptional circumstances" such as where "testimony is 'patently incredible or defies physical realities.' " *Id.* at 133–34 (quoting *Sanchez*, 969 F.2d at 1414).

Moreover, in assessing the "interests of justice" in this case, it is important to recognize that the evidence of Pabon's guilt is overwhelming. The defense conceded from the opening that Pabon set up a program on his computer "that allowed his computer to trade files with other computers," and that he "did use that sharing program to receive and send child pornography on his computer." (Tr. 36.) It was

formally stipulated that pictures transmitted from the defendant's computer in Puerto Rico to an undercover police officer's computer in Rockland County, New York, and other pictures found on the defendant's computer, were visual depictions of actual children engaged in sexual activity. (Tr. 241–42; GX 5). The government's evidence included the fruits of a search of the defendant's computer, which contained over 500 photographic files and over 200 video files of child pornography. (Tr. 182–83.) Information obtained from the computer indicated that over 8,000 such files were exchanged with other users during a three-month period. (*See* Tr. 369–370, discussing GX 14, 19.) The government also presented testimony by the undercover officer who described going to an internet chat room called "preteenrapesex," where he encountered an advertisement that "was advertising child pornography for trade." (Tr. 71–72; *see* GX 15, 18.) The undercover officer explained the technical terms used in the advertisement to explain how files could be sent and received, and described how he downloaded child pornography from the advertised site. (*E.g.*, Tr. 100–13.) The officer also described how he contacted the proponent of the advertisement, who went by the screen name "Big Thing," and engaged in a conversation with him to identify him. (Tr. 145–50.) The defense did not dispute that "Big Thing" was in fact Pabon. The evidence that the defendant was guilty on both counts was so overwhelming that the defense was left largely without rational arguments to make to the jury.

It is against this background that we must assess the arguments that prejudicial error affected the jury's verdict.

## A. *Admission of Photographs*

The defense argues that admitting into evidence the actual pornographic photographs downloaded by the undercover officer or found on Pabon's computer was unfairly prejudicial because (1) that admission was not "balanc[ed] . . . by giving the defense's requested jury instruction" on the penalties that attach to each offence; and (2) the prosecutor made an "improper appeal to the jurors' emotional reaction of disgust and horror at the pictures," (Def.'s Mem. at 6.)

The decision to allow the government to admit a handful of examples of the child pornography at issue in the case was not error. At the outset of the trial the Court denied defendant's motion in limine to exclude the photographs in light of the defendant's willingness to stipulate that the photographs constituted actual child pornography. (10/7/02 Hearing Transcript at 9–12.) Pabon relied on *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), in which the Supreme Court held that, in a prosecution for possession of a firearm by a felon, it was an abuse of discretion to admit evidence detailing the nature of the defendant's prior offense where the defendant was prepared to stipulate that he was a felon. In *Old Chief*, however, the nature of the conviction had little probative value in connection with the offense being tried, nor any bearing on the seriousness of that offense itself. Allowing the jury to know that defendant had previously been convicted of aggravated assault would have prejudiced the defendant by potentially inducing the jury to consider him a dangerous man, without adding anything relevant to the issues on trial in the case.

 Here, however, the pornographic photos were extremely relevant. As is made clear by the defendant's post-trial motion, the stipulation that the files *did* contain depictions of actual children did not foreclose an argument, which defendant now makes, that he did not *know* the children in the photos were real. Examination of the photographs could pro-

vide the jury (and later this and any reviewing Court) with valuable insight into whether such an argument was plausible. Moreover, as the Supreme Court itself noted, *Old Chief* is an exception to the usual rule that "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." 519 U.S. at 186–87, 117 S.Ct. 644. The actual evidence can do what no stipulation ever could, "not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment." *Id.* at 187–88, 117 S.Ct. 644. This is a particularly significant factor in a case such as this, in which the "juror's duty does seem hard," *id.* at 187, 117 S.Ct. 644, given the sympathetic nature of the extremely young defendant, and the defense's strong appeal to the jurors' emotions that might well have rebelled at convicting a very young, very frightened defendant. Where the defense effectively urged the jurors to give a break to a young man of otherwise good character and high apparent promise, it would be unfair to leave the government relying on abstract propositions and bloodless stipulations, unable to confront the jurors with the nature of the offense charged.

The Second Circuit has expressly recognized the importance of such evidence, and the limited nature of the exception established by *Old Chief.* In *United States v. Velazquez*, 246 F.3d 204, 211 (2d Cir.2001), the Court noted that *"[i]n limited circumstances,* the Government can be required to accept a stipulation by the defendant to a particular fact," citing *Old Chief,* but that the government "generally has a right to present evidence of a fact that a defendant would prefer to admit." (Emphasis added.) In the case before it, the Court held that photographs of a victim's injuries, unlike the nature of the prior felony in *Old Chief,* were relevant "to the defendant's

culpability, ... and underscored the moral blame attaching to [the defendant's] decision to cover up the crime." *Id.* Here, exactly as in *Velazquez,* the photographs were "legally and morally relevant to the conduct constituting the offenses committed by" Pabon, *id.,*—indeed, as the Court remarked at trial, they were "the corpus delicti of the crime." (Tr. 415.)

Pabon argues, however, that the photographs should not have been admitted without an instruction to the jury concerning the penalties that attached to the offense. (Def.'s Mem. at 6.) He is certainly correct that the same logic supporting the admission of the photographs—*i.e.,* that a jury is inevitably engaged in something more than a "linear scheme of reasoning" and inevitably must confront the difficult moral project of deciding "to face the findings that can send another human being to prison [or] to hold out conscientiously for acquittal," *Old Chief,* 519 U.S. at 187, 117 S.Ct. 644—also supports the view that the jurors should be aware of the moral consequences of their decisions. This is especially the case where, as here, the average juror might well not remotely imagine that advertising child pornography not only carries a harsher penalty than actually delivering it, but that the penalty is a mandatory ten years in prison, even for a defendant who is little more than a child himself.

 But this is an argument for giving the jury more information, not less. As the parties are well aware, the Court was persuaded by that argument, and proposed to give precisely such an instruction. Unfortunately, the Court of Appeals at the government's urging issued a writ of mandamus forbidding such an instruction, concluding that to do so would encourage forbidden jury nullification. *See United States v. Pabon–Cruz,* No. 02–3080 (2d Cir. Oct. 11, 2002). I continue to believe that

this was a mistaken conclusion. This Court forbade the defense to argue nullification, and proposed to give (and gave) to the jury the usual injunctions against such nullification, adding only a pale sentence advising the jury of the maximum and minimum prison terms available for each offense. Unless one believed that the jurors, or substantial numbers of them, would find the penalties morally repugnant, it is difficult to understand how this simple information could be perceived as an "invitation" to the jury not to do its duty. (Tr. 22.) It is at least equally likely that knowing of a mandatory penalty might *discourage* jurors from "compromis[ing] in an improper fashion," as the government put it (Tr. 22), by strengthening a doubtful juror's resolve to face the "difficult" duty "to hold out conscientiously for acquittal," 519 U.S. at 187, 117 S.Ct. 644, rather than to yield in the expectation that the judge could soften any injustice by the exercise of sentencing discretion.

That issue, however, has been resolved, at least for purposes of this case, by the mandamus order of the Court of Appeals. To argue that the government therefore should not have been permitted to counter any tendency toward nullification by giving the jury access to the most compelling evidence of the crime is a non sequitur. Although this Court would have preferred to give the jury *all* the information relevant to its moral task, the reasons why the jury was permitted to see the photographs is independent of the argument over the jury instructions. The decision in *Velazquez*, and the reasons why the government "generally" is permitted to offer such evidence, of course did not and do not depend on any practice of advising the jury about penalties, since in the ordinary case jurors are not given that information.

██ Pabon also argues that the prosecutor's remarks in his rebuttal closing statement heightened the alleged prejudice of the photographs admitted into evidence. During rebuttal, the government closed by stating, "Look at these pictures. Look into the children's eyes. These are the pictures that the defendant was advertising to exchange and did exchange. Please keep these children in mind when you deliberate. We are not talking about some victimless crime here." (Tr. 396.) While these remarks may well have gone too far in attempting to appeal to the jurors' outrage, the Court quickly eliminated any prejudice by sua sponte giving a cautionary instruction, immediately admonishing the jury that "[t]he case is not about whether you disapprove of pictures, and the case is not about whether you think that the defendant is a sympathetic young man. The case is about the elements of the offenses that I am going to describe to you and whether the government has proved beyond a reasonable doubt that those offenses have been committed." (Tr. 396.) *See, e.g., United States v. Mapp*, 170 F.3d 328, 338 (2d Cir.1999) (noting that trial judge's prompt curative instruction "substantially eliminated" "any prejudice arguably caused").

To further reduce any possibility that either the prosecutor's summation or the underlying facts of the offense as represented by the photographs would prejudice the jury, the Court advised the jury that it would be improper for them "to allow any feelings you might have about the nature of the crime charged to interfere with your decision-making process." The Court emphasized that the issue for the jurors was not whether they "disapprove[d] of the conduct charged in the indictment, but whether the government has proved beyond a reasonable doubt that the defendant committed it." The jury was additionally instructed that the seriousness of the offense was all the more reason to be careful in their deliberations: "The more serious the crime, the more horrible it

would be to convict a person who was not guilty and the more careful you must be not to allow your disapproval of the crime to interfere with your assessment of the evidence." (Tr. 426.) These instructions served to focus the jurors on the issues properly before them.

In sum, neither the admission of the child pornography on its own nor the admission of the images considered in the context of the mandated revisions to the jury instructions and the prosecutor's rebuttal remarks come anywhere close to working the "manifest injustice" required to warrant a new trial.

### B. *Supplemental Jury Instruction*

The defense also argues that the Court's supplemental jury instruction was so confusing as to result in an improper verdict. (Def.'s Mem. at 6.)

Notwithstanding the clarity of the evidence, the jury deliberations in this case lasted longer than the presentation of the evidence. After nearly two days, the jury sent out a note asking for clarification of the meaning of the terms "advertisement" or "notice," asking whether "the ad or notice must specifically mention a visual depiction or will any ad or notice suffice?" (Tr. 466; Court Exhibit ("CX") 8.) As discussed above, to be convicted on Count One, Pabon had to knowingly make, produce, or publish an advertisement or notice, and which advertisement or notice had to seek or offer a visual depiction of a minor engaging in sexually explicit conduct whose production involved an actual minor engaging in such conduct.

After conferring with the attorneys and hearing suggested language, the Court shared with counsel the instruction it intended to give. (Tr. 468–69.) Although both the government and the defense had proposed their own suggestions for answering the jury's query, neither side objected to the substance of the instructions

as confusing or as misstating the law. (Tr. 470–73.) The Court then re-instructed the jury on the elements of Count One (in terms to which Pabon did not and does not object, either at the charging conference, after the original charge, at the time of the supplemental charge, or in his post-trial motion) and then gave the following supplemental instruction, which was directly responsive to the jurors' query:

> Not any kind of advertisement or notice will do. As I told you before, and as I just reread from the charge, the defendant had to knowingly make or publish a specific kind of notice or advertisement. In order to establish a violation of the statute, the government must prove beyond a reasonable doubt that the defendant made or published an advertisement or notice that sought to exchange, receive or distribute a visual depiction of the kind I defined for you. No particular magic words or phrases need to be included, but there must be proof beyond a reasonable doubt that the notice or advertisement concerned visual depictions of the kind I defined for you. Advertisements or notices, for example, that sought to exchange or distribute other kinds of material, such as written descriptions of sexual acts involving minors or other verbal as opposed to visual depictions of child pornography would not violate this statute.

(Tr. 475–76.) Shortly after this instruction, the jury sent out a note that it was deadlocked on Count One, but while the Court and the parties were discussing how to proceed, the jury sent another note stating that it had reached a unanimous verdict on both counts. The verdict was then announced in open court as the jury's unanimous verdict, and the jury was polled, each juror acknowledging the verdict as his or her own. (Tr. 481.)

■ Pabon argues that "[t]he timing of the verdict, following so quickly after the instruction suggests that the instruction played a large role in the final verdict," and points to post-trial events to support its claim. (Def.'s Mem. at 7, citing Affirmation of Jennifer Brown, dated Nov. 13, 2002, at ¶ 6.) The Court's findings regarding those events, based on its own observations, are as follows: After the jury announced its verdict and the trial had ended, two jurors returned to the courtroom. The other jurors, the prosecutors, and the Court Reporter had already left. The jurors explained to the Court and defense counsel that they had been confused by the final charge and now felt that they had made a mistake. The two jurors were visibly upset. The Court simply advised the jurors that their verdict was final, that the decisions jurors must make are sometimes painful, and that the jurors should be comforted that if they had acted according to their consciences, they were not responsible for any consequences the defendant faced.

To the extent Pabon relies on the claim that the jurors were subjectively confused, his motion must be rejected. Pabon has not sought (save indirectly, by means of counsel's hearsay affidavit) to offer the jurors' testimony about the state of mind that led them to agree to the guilty verdict. Such testimony would clearly be inadmissible. Rule 606(b) of the Federal Rules of Evidence prohibits jurors from testifying "[as] to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith." The only exception provided by the Rule is that "a juror may testify on the question whether extraneous prejudicial information was improperly brought to he jury's attention or whether any outside influence was improperly brought to bear on any juror." Fed. R.Evid. 606(b). Nothing in Pabon's motion, nor in the Court's observations at the time, gives the slightest indication of any such improper information or influence. As the Court of Appeals pointed out in *King v. United States*, 576 F.2d 432, 438 (2d Cir.1978):

> There is a judicial reluctance, for sound and easily understood reasons, "to inquire into the state of mind of any juror and into the conduct of the jurors during their deliberations." *United States v. Dioguardi*, 492 F.2d 70, 79 (2d Cir.1974). This is to avoid harassment of jurors, inhibition of deliberation in the jury room, a deluge of post-verdict applications mostly without real merit, and an increase in opportunities for jury tampering; it is also to prevent jury verdicts from being made more uncertain. *United States v. Crosby*, 294 F.2d 928, 950 (2d Cir.1961).[8]

Whether any individual juror felt confused or reluctant, or later decided that he or she had misunderstood some legal point, are all precisely the sort of matters that Rule 606(b) shields from disclosure. *Tanner v. United States*, 483 U.S. 107, 121–22, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).

■ There is no basis for any argument that the instruction cited was objectively confusing or inaccurate. The jury

---

8. Pabon has not sought permission to interview the jurors to further develop information of this nature. Because no showing of impropriety has been made, and because the matters the jurors discussed are clearly within the prohibition of Rule 606(b), any such request would be denied. *See United States v. Rosario*, 111 F.3d 293, 299–300 (2d Cir.1997); *United States v. Moten*, 582 F.2d 654, 664–67 (2d Cir.1978).

had asked "whether the ad or notice must specifically mention a visual depiction or will any ad or notice suffice?" (CX 8.) The correct answer, of course, was "neither"— on the one hand, there is no requirement that an advertisement must specifically state that it offers or seeks a visual depiction to violate § 2251(c)(1)(A); on the other hand, not just "any" advertisement will do, since the jury must be convinced beyond a reasonable doubt that the defendant published an advertisement that did in fact seek or offer to receive, exchange or distribute a visual depiction of minors engaged in sexual activity, and not some other form of material (such as a verbal description) that might be considered child pornography in the ordinary sense of the word.

This is precisely what the Court told the jurors. Moreover, the form of the instruction was favorable to the defense, in that it *began* by stating what would *not* suffice for conviction, and only after emphasizing that in order to violate the statute, Pabon must have knowingly published "a specific kind of notice or advertisement, ... [one] that sought to exchange, receive or distribute a visual depiction of the kind I defined for you," did the Court point out that "[n]o particular magic words or phrases need to be included." The Court then immediately repeated that "there must be proof beyond a reasonable doubt that the notice or advertisement concerned visual depictions" of child sexual activity, and again clarified that advertisements that sought or offered only written or verbal material "would not violate this statute." (Tr. 476.)

There is nothing confusing or even especially complex about this instruction. The jury did not seek further clarification of the instruction; far from stampeding the jurors to a verdict, the instruction was followed by a deadlock note, and only thereafter by the verdict. Pabon does not attempt to explain how the instruction could have confused the jury, or to suggest even now (as he did not at the time the jury's request was being considered) a way in which the instruction could have been reworded so as to be clearer.

Deliberations in this case were no doubt stressful. Pabon is a young and sympathetic defendant who faces a draconian penalty for his offenses. Determining another's fate is a difficult and emotional task. It is not surprising that the jurors struggled with their decisions both during deliberations and after the verdict, but nothing during or after trial suggests that the jurors were prevented from performing their sworn duty to apply the law as explained to them. The interests of justice would not be furthered by setting aside a verdict that was carefully determined by a jury of twelve on the grounds that two of those jurors, clearly unhappy at having rendered a difficult verdict, suggested after trial that they had been confused about their instructions.

## *CONCLUSION*

The defense's motions for judgment of acquittal and for a new trial are denied.

SO ORDERED.