**UNITED STATES of America**

v.

**Anthony MARCHAND, Defendant.**

**No. CRIM. 02–813.**

United States District Court,
D. New Jersey.

March 5, 2004.

Eric R. Breslin, Epstein, Becker & Green, PC, Newark, NJ, for Defendant.

Andrew D. Kogan, Daniel J. Gibbons, Tiffany M. Williams, United States Attorney's Office, Newark, NJ, for Plaintiff.

## OPINION

HOCHBERG, District Judge.

**Introduction:**

The Defendant, Anthony Marchand, is accused of possessing Child Pornography, in violation of the Child Pornography Prevention Act ("CPPA"), 18 U.S.C. § 2252A(a)(5)(B). The Defendant knowingly and voluntarily waived his right to a jury trial. Therefore, this Court is responsible for both findings of fact and conclusions of law. The issues for this Court are: 1) whether the images that the Defendant possessed depicted real minors and 2) whether the Defendant knew that the images he possessed depicted real minors.[1] In accordance with Fed.R.Crim.P. 23(c), this opinion constitutes this Court's findings of fact and conclusions of law.

## I. Findings of Fact:

### A. Background:

Dr. Anthony Marchand was employed by Atlantic Health Systems ("AHS") as director of the pathology lab at Overlook Hospital in Summit, New Jersey. In October or November of 2000, the hospital experienced substantial problems with its computer network. During an investigation into the cause of these problems, a network engineer for the hospital noticed

---

1. In this opinion, the terms minor and child are used interchangeably.

that Dr. Marchand's computer was accessing and downloading imagery from the internet, resulting in massive re-transmissions on the network. These re-transmissions would cause the network to crash. In April 2001, new firewall software was installed, due to the problems the hospital had experienced with the network. In addition, AHS installed a sniffer[2] to monitor traffic through the AHS firewall in an effort to identify internet use that violated AHS' policy.

Dr. Marchand used a computer designated OBE, with the password "amarchand" in his office at Overlook. Between April and August 2001, the OBE computer generated sniffer alerts several times a week while being operated by Dr. Marchand.[3] AHS then assigned a static IP address to Computer OBE to make it easier for the sniffer to trace information to and from Computer OBE and the Internet.[4] Monitoring of the sniffer revealed that Dr. Marchand accessed a variety of web sites that appeared to display child pornography. For example, the sniffer program indicated that the web sites accessed by the OBE computer contained information such as "free illegal site," "free illegal kds," "illegal ki()s porno video," "illegally shocking 3–11y.o," and "‗real‗illegal‗lolitas archive."[5]

AHS contacted the Federal Bureau of Investigation ("the FBI"), and on March 14, 2002, pursuant to a search warrant, the Government conducted a search of Dr. Marchand's office and office computer. When Dr. Marchand was informed that a search warrant for child pornography was being executed in his office, he accompanied the FBI agents and hospital staff to another office where he answered questions. He also handed several computer disks to Special Agent William DeSa ("Agent DeSa"). Later in the interview, Agent DeSa stated that his use of the term child pornography referred to "actual kids engaging in sexual activity, either with children or with adults." Tr. 1.118, 9–10.[6] During the interview at the hospital, Dr. Marchand stated that he had additional images at home, and that he thought he had approximately 500 images of child pornography. Dr. Marchand then accompanied Agent DeSa and Special Agent Tanya Lamb DeSa ("Agent Lamb")[7] to his home,

2. A sniffer is a device that monitors internet traffic across a firewall and generates alerts based on packets of information or key words that cross the firewall.

3. To confirm that Dr. Marchand was the person using the OBE computer to access the web sites which generated the sniffer alerts, the hospital installed a camera pointing at the door of Dr. Marchand's office. The tapes from the camera revealed that Dr. Marchand was present in his office each time the sniffer alerts from the OBE computer were generated.

4. When a computer accesses another network, such as the Internet, it addresses a server which assigns the computer an IP address. That IP address normally changes each time the computer accesses the server. To make it easier to monitor the OBE computer, the firewall administrator made the server assign the same IP address each time the OBE computer accessed the internet.

5. Incorrect spellings such as illegal and ki()s are used in an attempt to defeat sniffer programs.

6. Virtual child pornography was not discussed with Dr. Marchand at any time during the investigation. Because the Supreme Court had not yet rendered its decision in *Ashcroft v. Free Speech Coalition et. al.*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2001), there was no reason for the FBI Agents to have raised the distinction.

7. Special Agent Tanya Lamb later married Agent William DeSa. For purposes of clarity in this opinion, she will be identified as Agent Lamb, the name used during the investigation and interview of Dr. Marchand.

where he turned over several additional CDs and a computer. In total, the agents retrieved six CDs from Dr. Marchand's office and home as well as the central processing unit from Dr. Marchand's home computer. Dr. Marchand told Agent Lamb that collecting these images "...was a hobby, that he didn't realize that it was illegal or improper for him to have for personal enjoyment." Tr. 3.129, 19–24. Dr. Marchand also explained to Agent Lamb "that some of the images ... on the CDs ... were images that he had morphed.[8]" Tr. 3.137, 2–4.

## B. The Images:

The Government introduced into evidence 35 images from the total number seized.[9] The evidence depicts prepubescent children engaged in sexually explicit conduct. The following is a description of a tiny sample of the images in evidence: 1) prepubescent female digitally manipulating an erect male penis; 2) prepubescent female being forced to perform fellatio on an adult male penis while the adult male is physically restraining her with his body; 3) prepubescent female being vaginally penetrated by an adult male penis; 4) prepubescent female and prepubescent male performing fellatio on adult male; 5) prepubescent female performing fellatio on an adult male; 5) prepubescent female being vaginally penetrated by an adult male while a second male stands behind her masturbating his erect male penis; 6) prepubescent female whose head is being held by the hair about to be forced to perform fellatio.[10]

The children in each of the 35 images look real to the viewer. There is no indication in any of the pictures to alert the viewer that the image was created other than with the use of real children. The lighting in the images appears as it would in a photograph. The children's physical characteristics and their often highly expressive facial features are visible in great detail. A staple is visible in one of the images, indicating that the picture was taken from a compilation of multiple pages, such as a centerfold from a magazine. Some of the children are the subjects of a series [11] of pictures. In each of the pictures within one series, the child depicted has the same appearance, and other details of the images do not vary.

The children in the images range in age from three to fifteen. The Government's expert, Dr. Robert Johnson, estimated the age of the children by comparing the level

8. The Defendant used the term morphed to mean that he had in some way manipulated the images using the computer.

9. The total number of images of apparent child pornography in Dr. Marchand's possession far exceeded the number of images introduced at trial. Of the thousands of images seized, the Government sought to introduce into evidence that 3,400 appeared to be child pornography. This Court precluded the Government from introducing this number into evidence, absent a proffer that each of the 3,400 images was an actual minor child engaged in sexually explicit conduct. The Court permitted a sample of no more than 50 images to be introduced into evidence and further required that each image introduced have a foundation in direct or expert testimony that it was an actual minor child engaged in sexually explicit conduct. This requirement was imposed prior to trial (and prior to the waiver of a jury) to prevent the finder of fact from drawing inferences as to the Defendant's knowledge from images for which there was insufficient proof that real children were involved.

10. As distasteful as it is to describe the images in Government's Exhibits G100, G101A, G113, G125, G122, G112, and G104, this Court decided to use verbal descriptions rather than filing copies of the actual images, in order to avoid the further exploitation of the children involved.

11. A series refers to more than one picture of the same child.

of development of the children depicted in the images with the stages of sexual maturation designed by John Tanner ("the Tanner Scale"). The Tanner Scale shows pubic hair at specific stages and the age at which it is most likely to occur and the breast development in females and the genitalia, penis, and testicle development in males.[12]

Eleven of the images introduced were earlier published as photographs in child pornography magazines that were printed prior to 1986, a date when computer technology to create realistic virtual images of human beings did not exist. Eight of the images introduced depict actual identified and named children from the United States, England, and Brazil, who had been the subject of investigations by law enforcement into the sexual abuse they suffered. Six of the images were part of two different series of photographs. Each of the images had a file name, and Dr. Marchand organized them into folders. He named the subdirectory containing these folders, "child."

## C. Technology for Virtual Images:

Defense Counsel maintained a thorough, creative, and vigorous defense, attacking the Government's case. The main thrust of the Defense was to show that technology exists to create realistic virtual images of child pornography that are indistinguishable from real images of child pornography, and that nothing in the bit structure of the digitized computer image would inform a diligent observer that the image was real rather than virtual. This defense was presented in order to rebut the Government's proofs that the images possessed by the Defendant were of real human children and to create reasonable doubt as to whether Dr. Marchand knew that the images were real rather than virtual from information available to him at the time he possessed the images.

Computer software such as POSER was presented by the Defense. POSER is a tool for artists to use in creating virtual images of people. Although the Defense did not submit any images that had been created using POSER, the Government introduced a limited number of virtual images of clothed adults as examples of what POSER can do. Two of these images were part of a recent contest held by POSER. No nude adults or children were adduced nor were any virtual images of sexually aroused body parts.

The degree to which the images created with POSER appear real and the accuracy of the details depend on the skill of the artist. For example, the software does not create details such as hair growth or vein visibility through skin, although POSER will adjust the size of each body part to be in proportion with the size of the overall human figure. Unlike images that are created by manipulating and "cutting and pasting" pre-existing images, images created with POSER will not contain internal inconsistencies in the background, known as artifacts, which indicate that the pictures are not real. However, when backgrounds other than those created by POSER are imported into the images, POSER will not automatically create proper lighting effects, leaving it to the artist to ensure that the lighting effects, such as shadows cast by one body upon an adjacent figure or upon the ground, appear realistic. The pictures that the Defendant's expert characterized as indicative of pictures created with POSER do not appear at all realistic to the viewer.

---

12. Some of the children were too young to be classified according to the Tanner scale. For these pictures, Dr. Johnson estimated the ages of the children depicted using his 30 years of experience in treating children.

## II. Application of the Facts to the Law:

### A. The Charges Against the Defendant:

Dr. Marchand is charged with violating 18 U.S.C. § 2252A(a)(5)(B) by knowingly and willfully possessing six computer disks which contained at least three images of child pornography as defined in 18 U.S.C. § 2256(8)(A), which images were shipped and transported in interstate and foreign commerce and which were produced using materials that had been shipped and transported in interstate and foreign commerce.[13]

### B. The Elements of the Crime of Possession of Child Pornography under the CPPA:

The Government must prove: 1) that the Defendant possessed at least one image of a real minor engaged in sexually explicit conduct; and 2) that the Defendant knew that at least one of the images contained a picture of a real minor engaged in sexually explicit conduct.[14] 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing "any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer."[15]

Child pornography is defined in 18 U.S.C. § 2256(8) as any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct,[16] where the production of such visual depiction involves the use of a minor[17] engaging in sexually explicit conduct.[18] 18 U.S.C. § 2256(8)(A).

To prosecute a defendant under this section, the Government first must prove beyond a reasonable doubt that the image depicts a real child. Prior to the U.S. Supreme Court's decision in *Free Speech Coalition et al. v. Ashcroft*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002), the definition of child pornography included a visual depiction which appeared to

---

13. There is no charge of obscenity.

14. Possession of a single such image, with the knowledge that it depicts a real minor, is sufficient. Although there is an affirmative defense that may apply when the Defendant possesses less than three images, this defense is not applicable to this case because the number of images possessed was large and because the Defendant neither destroyed each image nor reported the matter to law enforcement, as the affirmative defense requires. 18 U.S.C. § 2252A(d).

15. The Defendant stipulated that the images he possessed were either mailed, shipped, or transported in interstate or foreign commerce or were produced using materials that were mailed, shipped, or transported in interstate or foreign commerce.

16. Sexually explicit conduct means "actual or simulated a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between persons of the same or opposite sex; b) bestiality; c) masturbation; d) sadistic or masochistic abuse; or e) lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2).

17. A minor is any person under the age of eighteen years. 18 U.S.C. § 2256(1).

18. Child pornography also includes such a visual depiction that has been created, adapted, or modified to appear that an identifiable, actual minor is engaging in sexually explicit conduct, (18 U.S.C. § 2256(8)(C)), commonly known as "morphing." However, there is no charge that the Defendant possessed the type of child pornography defined in 2256(8)(C).

be a minor engaging in sexually explicit conduct. 18 U.S.C. § 2256(8)(B). To the extent that this definition encompassed images that were generated entirely by computer, without the use of any actual minors, the Supreme Court held in *Free Speech Coalition* that, absent an obscenity charge, such material was protected by the First Amendment. Thus, the possession of virtual images of minors engaged in sexually explicit conduct is not a crime under the statute charged in this case.

■ The Government must also prove beyond a reasonable doubt that the Defendant knew that the images he possessed depicted real minors engaged in sexually explicit conduct. *U.S. v. X–Citement Video, Inc.*, 515 U.S. 64, 78, 115 S.Ct. 464, 472, 130 L.Ed.2d 372 (1994). In *X–Citement Video*, the Court held that the term "knowingly" refers to the minority age of the persons depicted and the sexually explicit nature of the material. *Id.* Thus, *Free Speech Coalition* and *X–Citement Video*, read together, require the Government to prove that the defendant knew the images he possessed depicted real children engaged in sexually explicit conduct.[19]

### C. Proofs That the Images Depicted Real Minors:

■ The Government presented evidence that: 1) eleven of the images were taken from magazines created prior to the invention of computer technology that might make it possible to digitally create such images; 2) law enforcement agents from the U.S., England, and Brazil could positively identify by name the children in eight of the pictures as children whom they had met in person at a time not distant from the age that the child was when he or she was photographed; and 3) an opinion, from a qualified expert who reliably studied the images, that the physical development of the children depicted in the 35 images corresponds to the Tanner scale designed to show the level of physical development that children reach at different ages.

The Government linked the pre–1986 magazine photographs to the images that the Defendant downloaded from the internet. The Government's computer expert testified that one of the ways to determine whether an image depicts real children is to compare the image to those in the FBI's Child Exploitation and Obscenity Reference File ("Reference File"). The Reference File contains approximately 10,000 images of scanned child pornography that were taken when computer technology was so primitive that a sound inference could be drawn that an image found in the Reference File depicts a real child. Eleven images possessed by Dr. Marchand matched the images in the Reference File and are found to be images of real minors engaged in sexually explicit conduct.[20]

The Government also adduced proof in the form of direct witness identification of real children in eight of the images in evidence. These witnesses identified the children who appeared in the pictures, having met the children during law en-

---

19. The Government has so stipulated.

20. The slight alterations in the magazine pictures contained in four of the images (exhibits G104, G106, G108, and G112) do not alter the conclusion of fact that the children in the images are the same as those in the magazine photographs. In one of these computer images, the picture is simply a mirror image of the one in the magazine. Two other images portray a child depicted in a magazine photo, but the computer image has color and virtual semen added. A fourth image portrays the same children depicted in a magazine, but the staples visible in the computer image are in different locations than they are in the magazine. It is clear that the children depicted in the computer images are the same as the children depicted in the magazine photographs, and the sexual activity is the same.

forcement investigations into the abuse that these children had suffered.

Officer James Feehan of the Police Department in Peoria, Illinois positively identified the child in G122 as Melissa, who was between nine and ten years old when her father took pornographic pictures of her and distributed them over the internet. During his investigation, Officer Feehan met Melissa when she was fifteen years old. He testified that Melissa looked nearly the same at that age as she had looked five or six years earlier when the pornographic pictures were taken.

Special Agent John Brunell of the Kansas City Division of the FBI positively identified Chelsea as the child portrayed in G118. Agent Brunell met Chelsea when she was fifteen years old, while he was investigating the abuse she had suffered. The photographs of Chelsea that he seized during this investigation portray the same child who is depicted in G118. The title of the file containing Chelsea's image is "11yoposing13.jpg," suggesting to the Defendant that Chelsea was eleven years old when this photograph was taken.

Dr. Helio Sant'Anna e Silva, Jr., the Chief of Federal Police in the State of Santa Caterina, Brazil, identified the children in G115, G116, and G117. These images depict real children S.R.O.V., A.D.S.N., and W.R.O., who were ten, fourteen, and twelve years old, respectively when the pictures were taken. Dr. Silva was able to positively identify these children because he met them in the course of his work.[21]

G113, G125, and G128 depict a family of child victims from the United Kingdom, including Helen and Gavin. Officer Sharon Girling of the National Crime Squad in London positively identified these children in the images, having met the children during the investigation of their abuse. Helen was approximately nine years old when the photographs were taken, and Gavin was under the age of eleven.

The Defendant argues that the Government failed to provide any evidence that eight of the other images introduced depict real children. The Court does not reach this issue because it finds that the Government proved beyond a reasonable doubt that at least nineteen pictures possessed by Dr. Marchand portrayed real children.[22]

This evidence leaves no reasonable doubt that the images depict real children. Through direct identification of children, both by law enforcement and by comparison with the FBI Reference File, and through evidence of the appropriate level of development of each of the children depicted, the Government has proven beyond reasonable doubt that the files Dr. Marchand possessed contain pictures of real children.

## D. The Defendant's State of Knowledge:

The Court has reviewed evidence regarding: 1) the appearance of the images; 2) the number of images; 3) the number and identity of web sites the Defendant accessed; 4) the language used in the web sites; 5) the mode and manner by which the Defendant viewed and stored the images; 6) the Defendant's state of mind; and 7) the available computer technology and manual skill required to create realistic virtual images, including a small sample of such images posted on the internet and created with the software most frequently discussed by the Defense. From this evidence, this Court must determine whether

---

21. Dr. Silva refers to the children by their initials pursuant to Brazilian law which forbids the disclosure of names.

22. The Court notes that there is evidence from which it could infer that the remaining images depict real children.

there is sufficient evidence from which an inference can be drawn beyond a reasonable doubt that the Defendant knew that the images he possessed were of real children engaged in sexually explicit conduct.

■■ The knowledge element can be proven through direct and/or circumstantial evidence of actual knowledge and through a finding of willful blindness.[23] A Defendant acts knowingly if the fact finder finds beyond reasonable doubt that the Defendant acted with deliberate disregard of the truth. "The Government may prove that a person acted knowingly by proving beyond a reasonable doubt that that person deliberately closed his eyes to what otherwise would have been obvious to him. One cannot avoid responsibility for an offense by deliberately ignoring what is obvious." *U.S. v. Stewart*, 185 F.3d 112, 126 (3d Cir.1999) (quoting a jury instruction approved in *U.S. v. Stuart*, 22 F.3d 76, 81 (3d Cir.1994)); *see also, U.S. v. Khorozian*, 333 F.3d 498, 508 (3d Cir.2003) (holding that the evidence supported a finding of willful blindness sufficient to satisfy the knowledge required for intent to defraud). To find knowledge based on willful blindness, it is not enough that a reasonable person would have been aware of the high probability of the truth. The Defendant himself must have been aware of the high probability that the images depicted real children. *U.S. v. Stewart*, 185 F.3d at 126. The Defendant's stupidity or negligence in not knowing is not sufficient to support a finding of knowledge based on willful blindness. *See, e.g., U.S. v. Caminos*, 770 F.2d 361, 366 (3d Cir.1985).

■ The Defendant argues that the application of willful blindness is not appropriate in this case because a computer can create virtual images of children that appear realistic. Although an inference of knowledge based on deliberate ignorance is not appropriate when there is no evidence of the Defendant's knowledge, that is not the case here. *U.S. v. Bissell*, 954 F.Supp. 903, 915 (D.N.J.1997). While the Court allowed the Defendant to introduce a Congressional Finding (1996 Congressional Finding note (5) following 18 U.S.C. § 2251) and the Solicitor General's argument in *Free Speech Coalition*, both of which suggested that the technology exists to create virtual images that are difficult to distinguish from real children, Congress also found that the technology will remain prohibitively expensive for the foreseeable future. 2002 Congressional Finding No. 11. Moreover, to determine the proper weight to give these findings, this Court must consider the context in which they were made and their lack of specificity. These were general conclusory statements by speakers unaware of the facts of this case. *See U.S. v. Rearden*, 349 F.3d 608, 614 (9th Cir.2003)(holding that Congressional Findings regarding the improvement of imaging technology did not conflict with the computer expert's testimony that the images possessed by the defendant were not virtually created). The Court does, however, consider the Congressional Finding and the Solicitor General's argument in determining whether reasonable doubt exists as to this Defendant's state of knowledge that his images portrayed real children in sexually explicit conduct.

The Defendant points to the following cases in other jurisdictions in support of his argument that it is impossible for the Government to prove Defendant's knowl-

---

**23.** A decision can rest on both actual knowledge, and, in the alternative, willful blindness. It is permissible to provide juries with instructions regarding both actual knowledge and willful blindness because the jury is entitled to base its decision on either theory. *U.S. v. Wert–Ruiz*, 228 F.3d 250, 252 (3d Cir.2000). Because this Court sits as the trier of fact in this case, it too may consider both possibilities.

edge beyond a reasonable doubt. *See U.S. v. Fox,* 248 F.3d 394, 403 (5th Cir.2001)(Government's computer expert conceded that there is no way to know whether a person depicted in the image actually exists)[24]; *U.S. v. Ellyson,* 326 F.3d 522, 532 (4th Cir.2003)(Government's agent testified that he did not know whether some of the images possessed by the Defendant and introduced into evidence were created using real children or not); *State v. May,* 362 N.J.Super. 572, 829 A.2d 1106, 1111 (2003)(state's expert conceded his inability to distinguish between a real child and an image that is computer-generated). However, in these cases, the Government did not prove that the pictures contained real children. Thus, in *Ellyson* and *May,* the lower courts erred in allowing the jury to base their decisions on images that might or might not depict real children. *Ellyson,* 326 F.3d at 531; *May,* 829 A.2d at 1108.[25] By contrast, in this case, the evidence is clear that the children were real. The crux of the issue in this case is whether the Government's evidence proved beyond a reasonable doubt that the Defendant knew that the pictures were of real children. Among other evidence, the Court considers: the details of each image, the staple that appeared in one of the images, a file name that includes the age of the child, the large number of images and the substantial number of separate web sites from which the pictures were downloaded, the fact that certain images showed the same child over and over again as part of a series, the very real facial expressions of the children (sometimes multiple children in the same image), the extremely detailed close-up of an erect male penis with veins engorged, one video of child sex abuse in progress, and the background in the photographs depicting highly detailed furniture, rumpled bedding, general household clutter, and extremely realistic lighting effects.

■ The circumstantial evidence from which an inference of knowledge may be drawn includes the appearance and number of images which were proven to depict real children. *U.S. v. Pabon–Cruz,* 255 F.Supp.2d 200, 207 (S.D.N.Y.2003)(holding that jurors could determine from the appearance and number of images possessed that the defendant could not have believed they were all produced using digital technology rather than real children). The Government presented this Court with fewer images than it presented to the jury in *Pabon–Cruz.* However, *Pabon–Cruz* is still instructive regarding the type of evidence from which an inference of knowledge may be drawn. The appearance of the images and the number of them, once they are proven to depict real children, is appropriate circumstantial evidence that this Court may use to draw an inference of knowledge, including whether or not there is reasonable doubt that Dr. Marchand knew that at least one of the 35 images in evidence[26] depicted a real child engaged in sexually explicit conduct.

This Court has viewed the images itself in considering whether reasonable doubt

**24.** This decision, which upheld the CPPA's ban on virtual child pornography, was reversed by *Ashcroft v. Free Speech Coalition et. al.*

**25.** In *Fox,* the Court simply relied on the expert's testimony to support its decision that the law did not violate the constitution by applying to virtual images.

**26.** As stated earlier in footnote 9, the total number of images of apparent child pornography in Dr. Marchand's possession far exceeded the number of images introduced at trial. The Court permitted only a sample of images to be introduced into evidence and further required that all images introduced have a foundation in direct or expert testimony that they were actual minor children engaged in sexually explicit conduct.

exists as to Dr. Marchand's knowledge that the children depicted in the images were real. All of the children in the 35 images look utterly real. The level of detail of the children's features in all of the images contrasts startlingly with the sample of POSER virtual images adduced as evidence of the best examples of what virtual-image technology can do. A staple is visible in the center seam of one of the images, which clearly indicated that the image was of a photograph previously stapled into printed matter. Some of the children were depicted in series. Such accurate series would be extremely difficult to create virtually without error. The sexual development of each child corresponded correctly to the age of each child, as evidenced by Dr. Johnson's testimony. The features and traits of the children in the images can be matched to a particular age range. For example, the level of breast development in images of a prepubescent girl corresponds appropriately to the level of pubic hair depicted. It is difficult enough for an artist working with virtual technology to accomplish this feat as to one image, let alone to repeat such mastery each time a child at a different age of prepubescence is created. This feat would be difficult to achieve even if the artist had the training and expertise of Dr. Johnson to know how much pubic development to show in order to correspond to the age of the child depicted in each of the images. Dr. Marchand, a trained medical professional, would have seen how accurate the level of sexual development was in the prepubescent nudes he saw.

The multiplicity of images and the fact that the Defendant downloaded them from different web sites also supports a finding that Dr. Marchand knew that at least one of the images depicted a real child. The Court considers all of the evidence, including logical inferences therefrom, based on human experience. Could the Defendant have thought that each of the 35 images, downloaded from many unrelated web sites, was each digitally created by an artist who was skillful enough to complete the task so extraordinarily realistically? It is not as though Dr. Marchand confined himself to one web site which he believed was dedicated to virtual images. Is there reasonable doubt that this Defendant knew that in surfing the web for diverse child pornography sites, he would find at least one picture of a real child engaged in sexually explicit conduct? [27]

In addition to the 35 images themselves, the Government also presented direct evidence regarding the Defendant's state of mind. Dr. Marchand defended himself in his interview with Agent Lamb by saying, *inter alia*, that he did not know it was illegal to possess the images and that some of the images were morphed (digitally manipulated using parts of different real children) on the CDs that he created. By distinguishing between pictures that were morphed and those that were not, the Defendant certainly implied that he believed that the "un-morphed" images depicted real children.[28] Dr. Marchand attempted

**27.** Defendant argues that he did not seek out all the web sites from which he downloaded images. Rather, he received some of the images via "Java Bombs" which appear on a User's screen when the User accesses a web site with similar content. This fact does not support the Defendant's argument that there is insufficient evidence from which an inference of knowledge can be drawn beyond a reasonable doubt. Dr. Marchand essentially argues that he might well have believed that each and every image he received automatically via Java Bombs, rather than via web sites that he intentionally accessed, was virtually created.

**28.** The Court notes this distinction, but does not place great weight on it because the term "morphed" was not fully defined by Dr. Marchand during his interview.

to exculpate his conduct by claiming that some images were morphed, but his effort at exculpation never claimed that some of the images were virtual. Moreover, the FBI agents told Dr. Marchand that they were interested in pictures of "actual kids engaging in sexual activity, either with children or with adults," and Dr. Marchand responded by saying that he had about 500 images of child pornography. This also sheds light on his state of mind. The Defendant's characterization of 500 of his images as child pornography, especially in light of his effort to distinguish between those that were morphed and those that were not, supports a strong inference that he knew that at least one depicted a real child.[29]

In an effort to rebut the Government's proof as to the Defendant's state of mind, the Defendant points to evidence that he had labeled some of the disks that were seized "Yoda." Defendant argues that this indicates that he believed the children in the images were not real, just as Yoda, a fictional character from the movie Star Wars, is not a real person. This label does not shed light on Defendant's knowledge of the content of the pictures he downloaded, because Yoda was his pet name for the very large computer play station that he used to view the images, and bears no relationship to the images themselves.

The Defense did prove that software like POSER exists and can be used to create virtual images. In order to be persuaded by the Defendant's argument that the existence of POSER creates reasonable doubt, the fact finder must consider whether the Defendant believed that this virtual software was so widely used in 2002, with such consistent skill, that 35 different realistic action images of nude children and adults, including several in a single image, would appear on a wide range of child pornographic web sites.[30] The Government introduced proof that POSER-created images do not look even remotely realistic. No POSER-created image was adduced of a single realistic-looking human, even fully clothed. No evidence of virtual, nude, sexually-aroused adults or virtual, nude, prepubescent children was adduced. No virtual action image was introduced. When asked whether the POSER images introduced into evidence were typical of the type of images that could be created using POSER, the Defendant's computer and internet technology expert testified that the images were indicative, though not necessarily typical, of the kind of images that could be created using POSER. Tr. 4.87, 13–17. Not one looked like a real person. Yet, every picture that the Defendant possessed appears absolutely real. Even the lighting and the shadows in each of the pictures is perfectly consistent with the various backgrounds contained in the images, a highly difficult feat to accomplish virtually.[31] Even the Defendant's comput-

29. This Court does not draw an inference from the actual number of images the Defendant possessed because the Government did not introduce proof that each and every one of those images constituted child pornography. Rather, this Court draws an inference from Defendant's stated belief that he possessed 500 images of child pornography, only "some" of which were morphed.

30. The Court agrees with the Defendant that the lack of internal inconsistencies, or artifacts, does not itself indicate that the Defendant must have known the pictures were made using real children. Images created using POSER do not contain such artifacts because they do not include pre-existing pictures.

31. As the Defendant's expert testified, POSER will not automatically create proper lighting effects, unless the background has been specifically created for POSER. He further testified that he had not seen POSER images in which reflections of light off human skin were added automatically by the computer software. Tr. 4.107—4.110.

er expert, when asked to point out those images that did not look like real photographs, could only point to one image, G121, and no others. Moreover, the expert conceded that when he looked at the pictures, he thought they were real. Tr. 4.83, 13–17.

Finally, this Court considers the testimony provided by Defendant's computer expert who testified that it is impossible to determine whether an image contains a picture of a real child or a virtually-created child, by examining the bit structure of the computer file. However, the bit structure for at least one of the Defendant's images did show that it was created by a digital camera, suggesting a photographic process rather than a virtual artistic process. Moreover, bit structure is a bit of a red herring. It is the appearance of the pictures themselves, the Defendant's own words, the lack of evidence that it is feasible to create large numbers of life-like, virtual, nude, prepubescent children with correct levels of sexual development, and the lack of evidence that it is feasible to create virtual, anatomic, sub-dural sexual arousal, the number of web sites which the Defendant visited, and the evidence presented regarding the Defendant's state of mind, that are most probative to a fact finder when assessing the Defendant's knowledge.

In this case, the evidence proves beyond a reasonable doubt that the Defendant knew that at least one of the pictures contained an image of a real child engaged in sexually explicit activity. The level of accurate detail in every picture, such as lighting, hair growth, and visible vein engorgement, along with obvious indicators such as the visible staple in one of the pictures, *inter alia*, convinces this Court that the Defendant could not have believed that each and every picture was created without using a real child. The facts in this case also prove beyond a reasonable

doubt that Dr. Marchand was aware of the high probability that the pictures depicted real minors and that he deliberately ignored the truth and was not merely foolish or negligent in failing to realize that the images portrayed real children. If the Defendant did not have actual knowledge that real children were portrayed, then he deliberately avoided knowing the truth.

**Conclusion:**

The Government has proved beyond a reasonable doubt each element of the crime of possession of child pornography by Dr. Marchand. While *Free Speech Coalition* now imposes a heavy burden on the Government in its proofs, in this case, that burden has been satisfied.