{¶ 1} Defendant-appellant Paul Kraft appeals his convictions for rape and pandering sexually oriented material involving a minor. For the reasons that follow, we affirm the trial court's judgment.
 I. Factual Background {¶ 2} On March 7, 2005, Special Agent Dan Devine of the United States Secret Service, working undercover as part of an electronic-crimes task force in Miami, Florida, logged onto Yahoo!'s now defunct user-generated "Preteen Baby Toddler Sex" chatroom. While in the chatroom, Devine saw a public message from a person with the email address bigman042003 ("Bigman") directing other parents to contact him if they "wish[ed] to cam-to-cam with me, my daughter and your kids * * *." Bigman's Yahoo! profile indicated that his real name was Paul and that he was a 30-year-old married male living in Cincinnati, Ohio. In the hobby section of the profile, he indicated that he was interested in "sex, sex, sex" and that he was "domina[nt]" and had "no limits," and that he preferred women with no limits. Devine had learned in past investigations that the reference to "no limits" indicated that the person was willing to engage in sexual activities with children.
 {¶ 3} Using the screen name lisa_n_miami ("Lisa"), Devine posed as a 30-year-old female with a ten-year-old daughter. Devine, as Lisa, responded to Bigman in a private message that started an on-line conversation about broadcasting sexual acts involving their children. Bigman, using the screenname Matercock, asked Lisa about her daughter's age and what sexual acts the child performed. Bigman then said that his *Page 3 
daughter was four years old, and that "mine does everything but i don't pentrate [sic] her pussy, i do pentrate [sic] her ass." Bigman invited Lisa to view him sexually abusing his daughter if she would reciprocate. As part of his invitation, Bigman allowed Lisa to view him and his daughter posing for a webcam and advertised that he would "MAKE HER SUCK MY COCK FOR YOU AND I WILL RUB HER PUSSY AND SOME OTHER STUFF." Lisa claimed that the clarity of the image was insufficient for her to see the girl. Bigman then offered to show his daughter shirtless.
 {¶ 4} Bigman demanded that Lisa send him a live picture of her with her daughter. Instead, Lisa emailed him a picture of a fully clothed adult that had been altered by age-regression software to make it appear that the adult was her ten-year-old daughter. Lisa avoided sending Bigman a webcam image of herself with her daughter by claiming that she still could not see Bigman's daughter clearly. Frustrated, Bigman then told Lisa that she was a "fake" and "full of shit," and he ended the conversation.
 {¶ 5} The next day Lisa received four off-line emails from Bigman informing her that he would be on-line "tomorrow," and that "if I give you a [s]how or not depends on you and if you are willing to send me nude pics of [your daughter] and I [prefer] ones showing her being used."
 {¶ 6} Devine captured Lisa's on-line conversation with Bigman as a real-time file. Also, during the conversation, he began the process of contacting Yahoo! and tracing the bigman042003 email address to an Internet Protocol ("IP") address. Devine learned that the Internet provider for the account had assigned the IP address to Paul Kraft at 4954 Winneste, Cincinnati, Ohio 45232.
 {¶ 7} After communicating with Secret Service representatives in Cincinnati, Devine then contacted Detective Rick Sweeney of the Hamilton County Sheriffs *Page 4 
computer-crimes section. Sweeney secured a warrant to search Kraft's residence on the evening of March 8. When he arrived at the Kraft home, Kraft was not there, but Kraft's wife, four young sons, and three-year-old daughter, S.K., were present. When Kraft arrived home later, Sweeney arrested him.
 {¶ 8} During the search of the Kraft home, Sweeney seized Kraft's home computer. John Ruebusch, a forensic computer specialist for the Hamilton County Sheriff, recovered the data from Kraft's computer. He found over 215 child-pornography images stored in two locations on the computer. The first location was a zipped compressed file ("zip file") located within a subdirectory used by the Yahoo! Messenger application. Some of these images were in the active file structure of the operating system. The zip file had been last viewed at 11:40 p.m. on March 7, almost 24 hours before Kraft's arrest. The second location was an unallocated place on the hard drive containing files that had once existed but had been deleted.
 {¶ 9} Detective Sweeney interviewed Kraft after he had waived his Miranda rights. When asked about his web session with Lisa, Kraft initially denied any intent to engage in sexual activity with his daughter, whom he mistakenly believed to be four years old instead of three. He claimed that he was just role-playing in the chatroom with Lisa and with other parents as a ploy to be able to view other parents sexually abusing their children. But later in the interview Kraft admitted that, within the preceding few months, his daughter S.K. had performed fellatio on him three times and that he had anally raped her two times. He also admitted that some of these acts had been broadcast on the Internet via his webcam. Kraft described S.K. as inconsolable after he had anally raped her. Kraft also explained that he liked the "ideology of sex" and described a *Page 5 
history of sexually deviant behavior, including masturbating while viewing child pornography that was on his computer.
 {¶ 10} Soon after his confession, Kraft admitted to Susan Moore that he had sexually abused S.K., but not his other children. Moore, an employee of the Hamilton County Jobs and Family Services agency, had visited Kraft in the Hamilton County Justice Center to obtain Kraft's consent to place the five Kraft children in the temporary care of the agency.
 {¶ 11} After Kraft's arrest, Loreen Watkins, an intake investigator in the sexual-abuse unit of the Hamilton County Jobs and Family Services agency, transported S.K. and her brothers to the Mayerson Center at Cincinnati Children's Hospital for a sexual-abuse interview and physical examination. During her sexual-abuse interview, S.K. identified the vaginal area of her body as her "lady" and said that "daddy [had] touched her lady." Dr. Kathi Makoroff performed the physical examination of S.K. and determined that her vagina, rectum, and mouth appeared normal.
 {¶ 12} Eloise Caultron became the foster parent for S.K. and her twin brother immediately after Kraft's arrest. While bathing the children, she observed them playing a game they called "choo-choo," where they would use their private parts to hump and grind against the other's "back end." She also heard S.K. say that "my dad's got a big weewee" and that "he put his weewee in my butt and it hurt."
 {¶ 13} Devine sent the images recovered from Kraft's computer to the National Center for Missing and Exploited Children ("NCMEC"). This agency assists law enforcement agencies in child-exploitation investigations by cataloguing child-pornography images and sharing with law enforcement officials the victims' identities as learned in prior criminal investigations. In response to Devine's submission, NCMEC *Page 6 
sent him a technical-assistance report indicating that some of the images found on Kraft's computer involved children previously identified by law enforcement officials in child-exploitation investigations.
 {¶ 14} Kraft was charged in a 17-count indictment with various sex offenses. The first five counts alleged that Kraft had raped his three-year-old daughter.[1] These counts contained a sexually-violent-predator specification. The next two counts alleged that Kraft had pandered sexually oriented material involving a minor, namely his daughter, by advertising to disseminate and advertising to present her engaging in sexual activity.[2] The remaining ten counts alleged that Kraft had pandered sexually oriented material involving a minor by reproducing the material from the Internet[3] These counts concerned digital images and videos found on the hard drive of Kraft's home computer.
 {¶ 15} Prior to trial, Kraft moved to dismiss all the pandering counts, claiming that the pandering statute, R.C. 2907.322, was unconstitutionally overbroad and vague. The trial court overruled Kraft's motion. After a bench trial, the trial court convicted Kraft on all 17 counts and adjudicated him a sexual predator. The court then sentenced Kraft to a term of life imprisonment for each rape and to eight years of imprisonment for each pandering offense. The court ordered that Kraft serve the terms consecutively.
 II. Convictions under the Rape Statute {¶ 16} We first address Kraft's challenges to his rape convictions. Kraft was charged with five counts of violating R.C. 2907.02(A)(1)(b) for sexual conduct with S.K. *Page 7 
This provision states, "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." The statutory definition of "sexual conduct" includes anal intercourse and fellatio.[4] Two of the counts alleged anal intercourse and three of the counts alleged fellatio. Kraft admitted to committing each rape during his post-arrest interview with Detective Sweeney.
 {¶ 17} Kraft claims that his rape convictions were not supported by sufficient evidence. He argues that his confession to Detective Sweeney could not have supported his convictions where the state did not present any independent, competent evidence to corroborate his confession.
 {¶ 18} "The corpus delictiof a crime is the body or substance of the crime, included in which are usually two elements: (1) the act and (2) the criminal agency of the act."[5] Before a confession to a crime is admissible, the state must have some evidence outside of the confession tending to establish the corpus delicti.[6] We refer to this rule of evidence as the "corpus delicti rule."
 {¶ 19} Ultimately, Kraft is challenging the trial court's admission of Kraft's confession to Sweeney into evidence. We find no merit to his challenge.
 {¶ 20} The state's evidentiary burden under the corpus delicti rule is minimal:[7] only a "modicum of evidence" is necessary to satisfy the rule.[8] This evidence does not need to relate to every element of the offense[9] and can be circumstantial.[10] In this case, *Page 8 
the state met its burden where it presented admissible evidence of the rapes and Kraft's criminal agency in committing the rapes.
 {¶ 21} First, Dr. Makoroff opined that the "choo-choo" game S.K. participated in with her twin brother while unclothed, as well as S.K.'s description of sexual conduct, indicated that she had been the victim of sexual abuse. Makoroff s opinion was based partly on the out-of-court statements of S.K. that Watkins and Caultron repeated at trial. Kraft argued before the trial court and insists on appeal that the statements were hearsay and not admissible. The state did not attempt to admit S.K.'s statements as hearsay exceptions under Evid. R. 807.
 {¶ 22} The trial court sustained Kraft's hearsay objection and refused to admit the statements for the truth of the matter asserted. But the trial court allowed the state to introduce the statements for the limited purpose of establishing S.K.'s precocious knowledge of sexual activity as an indicator of sexual abuse, as testified to by Dr. Makoroff. The trial court did not err in making this evidentiary ruling.
 {¶ 23} Second, Kraft represented to lisa_n_miami during the Internet conversation that he had anally raped his daughter on prior occasions and that he could make her perform fellatio. Third, Kraft admitted to Susan Moore that he had sexually abused S.K. Finally, the police found over 200 child-pornography images stored on his computer. After reviewing this evidence, we are satisfied that the state met its burden of presenting some evidence of the corpus delicti, and that Kraft's confession was, therefore, admissible.
 {¶ 24} Accordingly, after reviewing the admissible evidence, including Kraft's confession, we hold that the state presented sufficient evidence of all the elements of the rapes. In a challenge to the sufficiency of the evidence, the question is whether, *Page 9 
after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[11]
 {¶ 25} Further, we find no merit to Kraft's argument that his rape convictions were contrary to the weight of the evidence. In a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[12] Kraft admitted to two different people that he had raped his daughter and told a third that he had had sexual activity with her, he actively solicited child pornography, and his young daughter's precocious knowledge of sexual activity indicated that she was a victim of sexual abuse.
 {¶ 26} Thus we reject Kraft's claim that his rape convictions must be reversed on the basis that they were not supported by sufficient evidence or that they were against the manifest weight of the evidence.
 II. Review of the Pandering Convictions {¶ 27} Next we review the propriety of Kraft's 12 convictions under the pandering statute.
 A. Constitutional Challenge to R.C. 2907.322 {¶ 28} Kraft argues that the trial court erred in overruling his motion to dismiss the pandering counts on the basis that R.C. 2907.322
is unconstitutionally overbroad *Page 10 
and vague. Kraft was convicted of violating three subdivisions of this statute, (A)(1), (A)(2), and (A)(4).
 {¶ 29} "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process."[13] The vagueness doctrine ensures "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."[14] This doctrine also ameliorates the danger of an arbitrary or discriminatory application of the law.[15]
 {¶ 30} In reviewing a constitutionally based challenge to a statute, we are mindful that legislative enactments enjoy a strong presumption of constitutionality.[16] To overcome this presumption, the challenging party must prove that the statute is unconstitutional beyond a reasonable doubt.[17]
 {¶ 31} We begin by examining the constitutional dimensions of restrictions on child pornography. The First Amendment does not protect child pornography because the state has a compelling interest in preventing direct and indirect harm to children who are sexually exploited.[18] But the United States Supreme Court, in Ashcroft v. TheFree Speech Coalition, held that pornographic materials that "appear to be" or "convey the impression" of a minor "engaging in sexually explicit conduct," but, in fact, do not involve the use of the minor, are protected speech, unless they are obscene.[19] These pornographic materials, which include computer-software-generated *Page 11 
pornography or pornography made by using youthful-looking adults, are part of what is referred to as "virtual child pornography."[20]
 {¶ 32} The Ashcroft Court held that a prohibition on pornography created without using real minors results in the abridgment of "the freedom to engage in a substantial amount of lawful speech," without the link to the same state interests implicated where actual children are abused.[21] Thus, the Ashcroft Court struck down two subdivisions of the Child Pornography Prevention Act of 1996 on the basis of overbreadth, where these subdivisions banned virtual child pornography that was generated by computer software or was created with youthful-looking adults.[22]
 {¶ 33} The statute at issue, R.C. 2907.322, prohibits the pandering of sexually oriented materials involving a minor where the panderer has "knowledge of the character of the material or performance involved."[23] The specific pandering acts are described in subdivisions (A)(1) through (A)(6) of the statute.
 {¶ 34} The statute also provides in subdivision (B)(3) that "the trier of fact may infer that a person in the material or performance involved is a minor if the material or performance, through its title, text, visual representation, or otherwise, represents or depicts the person as a minor."[24] This statutory inference applies to subdivisions (A)(1) through (A)(6).
 {¶ 35} Kraft claims that the statutory inference provided in subdivision (B)(3) of R.C. 2907.322 renders the entire statute unconstitutionally overbroad in light of the Ashcroft decision. *Page 12 
 {¶ 36} In State v. Huffman, this court rejected a similar overbreadth challenge to subdivision (A)(1) of R.C. 2907.322.[25]
The Huffman court began its analysis by noting that the scope of the ban in R.C. 2907.322(A)(1) is limited by its terms to the depiction of sexual activity by a minor. A "minor" is statutorily defined as a person under the age of 18.[26] Thus, unlike the statute at issue in Ashcroft, the statute here only proscribes pornography depicting an actual minor. (Emphasis added.)
 {¶ 37} With respect to the inference language found in subdivision (B)(3), the Huffman court held that this language merely restates the common-law doctrine that allows the state to prove its case with circumstantial evidence.[27] The Huffman court followed the reasoning of the Ninth Appellate District in State v. Morris[28] in coming to this conclusion.
 {¶ 38} Federal courts have held that, even after Ashcroft, a jury may rely on circumstantial evidence, including nonexpert testimony, in concluding that an actual minor was used in creating a pornographic image.[29]
 {¶ 39} The Huffman court recognized that the Eleventh Appellate District in State v. Tooley[30] had struck down R.C. 2907.322 as overbroad, after interpreting subdivision (B)(3) to reach virtual child pornography. But the Huffman court rejected this interpretation where the statute clearly proscribes only pornography depicting an actual minor. The Ohio Supreme Court will ultimately resolve this conflict between the districts, as Tooley and Huffman are both currently on appeal before the court. *Page 13 
 {¶ 40} After applying the rationale of the Huffman court to this case, we hold that Kraft's overbreadth challenges to subdivisions (A)(1), (A)(2), and (A)(4) of R.C. 2907.322 are meritless, where the statute does not attempt to criminalize the pandering of pornography created without the use of an actual minor.
 {¶ 41} Likewise, we find no merit to Kraft's contention that the statute is void for vagueness. In Huffman, we rejected an argument that subdivision (A)(1) of the statute does not provide fair warning of the proscribed conduct, where the "plain language" of the statute "informs an ordinary citizen that its prohibitions apply to pornography depicting an actual minor."[31]
 {¶ 42} We also held that the scienter requirement found in R.C. 2907.322 provides sufficient clarity to avoid inhibiting the exercise of protected speech.[32] Pursuant to this scienter requirement, an offender must have "knowledge of the character of the material or performance involved."[33]
 {¶ 43} Kraft argues to the contrary, claiming that advances in computer technology have rendered it difficult for a person to distinguish between images created with actual minors and those that are not, and, thus, that the statute inhibits him from possessing material depicting virtual child pornography, resulting in self-censorship. Under these circumstances, he claims that the statute's scienter requirement runs afoul of the First Amendment.
 {¶ 44} We do not agree: the statute's scienter requirement — knowledge of the character of the material or performance involved — requires evidence that the offender knew that the image involved a real minor.[34] The state must show that the offender *Page 14 
knew that the material depicted an actual minor because the pandering of non-obscene sexually oriented materials depicting adults or virtual children is not an offense. The age and actual existence of the performer "is the crucial element separating legal innocence from wrongful conduct."[35]
 {¶ 45} Further, the scienter requirement demonstrates that the focus of the statute is on the "calculated purvey[or]"[36] of child pornography. Thus, the statute comports with the First Amendment.[37]
 {¶ 46} Finally, we reject Kraft's self-censorship argument as a basis to invalidate the statute, where virtual child pornography is on the fringe of protected speech, and where the statute provides him with a reasonable degree of certainty concerning what conduct is proscribed. Under these circumstances, it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."[38]
 {¶ 47} Because R.C. 2907.322(A)(1), (2), and (4) only proscribe the pandering of pornography depicting an actual minor, these subdivisions of the statute are not unconstitutionally overbroad. Further, because the proscriptions in the subdivisions are clear, and the proscriptions only reach those who know that they are pandering pornography depicting an actual minor, the statute is not unconstitutionally vague. Accordingly, we hold that the trial court properly denied Kraft's motion to dismiss, and we overrule this assignment of error. *Page 15 
 B. R.C. 2907.322(A)(2) and (A)(4) Pandering Convictions {¶ 48} Kraft's R.C. 2907.322(A)(2) and 2907.322(A)(4) convictions were based upon his statements and conduct while participating in the "Preteen Baby Toddler Sex" chatroom and conversing with Lisa on-line.
 {¶ 49} Kraft argues that his convictions for pandering under subdivisions (A)(2) and (A)(4) of R.C. 2907.322 were not supported by sufficient evidence. First, he claims that the state failed to establish that he was the person who had made the on-line representations. Second, he claims that the evidence was insufficient because S.K. was not shown on-line engaging in sexual activity. Kraft also argues that his convictions were against the manifest weight of the evidence because he told Detective Sweeney that he did not intend to present any type of performance, but was only role-playing to get other parents to broadcast their children being raped. These arguments are feckless.
 {¶ 50} The state established that Kraft, in fact, had made the representations concerning the display of his daughter participating or engaging in sexual activity. Agent Devine testified that he traced the email address used to make the representations to Kraft's computer. Additionally, the police found in Kraft's home the T-shirts Kraft and S.K. had worn in the webcast. Finally, Kraft admitted to Officer Sweeney that he had made the representations.
 {¶ 51} Next, we reject Kraft's contention that he could not have been convicted under these subdivisions where he did not display S.K. engaging in sexual activity. Subdivision (A)(2) proscribes both the dissemination of material showing a minor engaging in sexual activity and the advertisement to disseminate this material. (Emphasis added.) Subdivision (A)(4) proscribes the presentation of a performance that shows a minor participating or engaging in sexual activity or the advertisement to *Page 16 present such a performance. (Emphasis added.) The provisions do not require that the defendant actually disseminate or present the material showing a minor participating or engaging in sexual activity.
 {¶ 52} Where the state presented evidence that Kraft had used a public Internet chatroom to offer to other parents the opportunity to view a webcam broadcast of his sexual activity with his three-year-old daughter in exchange for the viewing of similar activity, and that he later made the same offer to Lisa, the state presented sufficient evidence to establish a violation of subdivision (A)(2).[39]
 {¶ 53} Likewise, where Kraft, in an on-line conversation, specifically offered Lisa the opportunity to view his three-year-old daughter performing fellatio on him and then presented the child to Lisa on webcam, the state presented sufficient evidence to establish a violation of subdivision (A)(4).[40]
 {¶ 54} Finally, we reject Kraft's contention that these convictions were against the manifest weight of the evidence because he was only "role-playing." Kraft told Detective Sweeney that he was only role-playing both with Lisa and with other parents on previous occasions when he had sought child pornography. But, later in the same interview, Kraft admitted to Sweeney that he had actually broadcast his rape of S.K. over the Internet in the past. After our review of all the evidence presented and our consideration of the inconsistencies in Kraft's statements, we cannot say that the trier of fact clearly lost its way in finding Kraft guilty of these offenses.[41] *Page 17 
 C. R.C. 2907.322(A)(1) Pandering Convictions {¶ 55} Kraft raises several challenges to his ten convictions for pandering sexually oriented material in violation of R.C. 2907.322(A)(1). These convictions were based upon images that Ruebusch had found on Kraft's computer. Ruebusch saved these images on a CD-ROM that was admitted into evidence at trial as State's Exhibit 14. Printouts of the images were also admitted into evidence, except for two video clips that served as the basis of count 15.
 {¶ 56} R.C. 2907.322(A)(1) provides, in relevant part, that "[n]o person, with knowledge of the character of the material or performance involved, shall * * * "reproduce* * * any material that shows a minor participating or engaging in sexual activity * * *."[42]
 {¶ 57} Kraft claims that the state's evidence was insufficient to establish (1) that the images depicted real children, (2) that he had knowledge of the "character" of the material, and (3) that he had reproduced the material. He also claims that the state did not offer into evidence the images corresponding to counts eight and nine.
 {¶ 58} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[43] *Page 18 
 1. Proof of Actual Minors {¶ 59} Determining whether images are real or virtual is within the province of the factfinder.[44] The factfinder may rely on direct as well as circumstantial evidence in concluding that an image depicts an actual minor participating or engaging in sexual activity.[45]
Although virtual child pornography is difficult to distinguish from real child pornography, the state can meet its burden without expert testimony or direct evidence of the age of the person in the image, where the evidence presented, viewed in the light most favorable to the state, supports a finding beyond a reasonable doubt that the image is a real child. The record in this case does not contain any direct evidence, such as testimony from the creators, that the content of the images at issue were either digitally created or altered.
 {¶ 60} To establish the age and authenticity of the child depicted in these images, the state presented the deposition testimony or live testimony of law enforcement officers who were involved in the criminal investigation of the images.
 {¶ 61} Kraft presented an expert in digital imaging, Dean Boland, to undermine the state's evidence. Boland testified that a skilled digital-image maker, or imagrapher, could create virtual child pornography with age-regression software, with image-morphing software such as Photoshop, or with image-creation software that allowed a user to create images from a blank screen. He demonstrated the use of some of this software, but none of the images used in the demonstration involved the use of nude adults or children. Boland also informed the court that the *Page 19 
production of a video image required much more skill and involved more resources than the creation of a still digital image.
 {¶ 62} After viewing the images at issue in this case, Boland opined that these images could not have been computer-generated from a blank screen due to the quality of the images. But he further opined that he could not determine if the images were the result of digital manipulation such as age-regression or morphing.
 {¶ 63} Boland testified that all the images found in the zip file had been completely changed by the process of compression when they were sent over the Internet. Boland admitted, however, that the process of compression did not alter the content of the image sent.
 a. Counts Eight and Nine {¶ 64} Counts eight and nine coincided with State's Exhibits 1 and 2. Contrary to Kraft's assertions, these exhibits were, in fact, offered and admitted into evidence. The state presented the deposition testimony of Yves Gobphar, a member of the Belgium Federal Police child-pornography unit, in support of these counts. Gobphar testified that he had coordinated a child-pornography investigation against a man named Chrestope Peete. As a result of the investigation, Peete had been convicted and was serving a prison term. Gobphar identified the images on State's Exhibits 1 and 2 as copies of the images that had surfaced during this investigation. State's Exhibit 1 was titled "babycumonalot.jpg," and State's Exhibit 2 was titled "Babysucker005.jpg." The images showed a female toddler participating in sexual activity. Gobphar testified that he had met the toddler, whom we refer to as C.P., and that she was 22 months old when the images were created. *Page 20 
 {¶ 65} Where Gobphar testified that he had actually met the toddler, we hold that the state presented sufficient evidence that the performer in the State's Exhibits 1 and 2 was a real minor.
 b. Counts 10 and 11 {¶ 66} Counts 10 and 11 corresponded to State's Exhibits 5 and 6. For these counts, the state presented the deposition testimony of Paul Griffiths, a detective with the United Kingdom's National Crime Squad based in London, England. Griffiths identified the images on State's Exhibits 5 and 6 as those he had recovered during a child-pornography investigation. The subject of the investigation pleaded guilty to six crimes and was currently serving six life sentences. Griffiths testified that he had met the eight-year-old girl performing the sex acts in the images. Griffiths indicated that the girl was born in 1993 and that the images were captured by a digital camera sometime between January 2001 and January 2002. He further testified that the subject of his investigation admitted to him that he was the male in the photographs participating in the sex acts with his child. Defense counsel objected during this testimony. The trial court overruled the objection, noting that Griffiths had actually met the girl. Kraft challenges this ruling on appeal.
 {¶ 67} We assume that the trial court erred in admitting the statements of the child sex abuser, where he did not appear at trial, and Kraft did not have an opportunity to cross-examine him.[46] But Confrontation Clause violations are subject to harmless-error analysis.[47] The state must show that a constitutional error was *Page 21 
harmless beyond a reasonable doubt.[48] A constitutional error is not harmless where a reviewing court determines that there is a reasonable probability that the evidence complained of might have contributed to the conviction.[49] To make this determination, a reviewing court examines a variety of factors, including the importance of the witness's testimony in the state's case, the cumulative nature of the testimony, the presence or absence of corroborating or contradictory evidence, the scope of cross-examination otherwise permitted, and the overall strength of the state's case.[50]
 {¶ 68} After reviewing the relevant factors, we hold that the error in this case was harmless beyond a reasonable doubt. We are confident that the inadmissible statements did not contribute to the finding of guilt, where Griffiths had already testified that he had actually met the child victim.
 {¶ 69} Accordingly, based upon the admissible evidence, we hold that the state presented sufficient evidence that the performer in State's Exhibits 5 and 6 was a real minor.
 c. Counts 12, 13, and 14 {¶ 70} Counts 12, 13, and 14 corresponded to State's Exhibits 7, 8, and 9, respectively. For these exhibits, the state presented the deposition testimony of Commandant Pascal Gariban of the French Judicial Police Division's Child Protection Brigade. Gariban stated that, in 2000, he was involved in a child-pornography investigation based upon photographs that had been circulating in *Page 22 
magazines. Gariban identified State's Exhibits 7, 8, and 9 as images involved in that child-pornography investigation. According to Gariban, these images depicted a man named Jacques Dugue engaging in sexual activity with a young boy. Gariban testified that Dugue had been prosecuted for raping the child depicted in the photographs in the late 1970s.
 {¶ 71} During the 2000 interview with Gariban, Dugue identified the child as J.S.D. and said that the photographs were taken at his home between 1974 and 1978. Gariban relayed Dugue's statements during his testimony, over defense counsel's objection. The trial court overruled the objections, and Kraft again challenges this ruling on appeal.
 {¶ 72} We assume that the trial court erred in admitting Dugue's statements to Gariban, where Kraft did not have an opportunity to cross-examine Dugue.[51] But we hold that the error was harmless beyond a reasonable doubt. We are confident that the inadmissible statements did not contribute to the finding of guilt, where Gariban testified that Dugue had been held criminally liable for raping the boy, and Gariban identified the images in State's Exhibits 7, 8, and 9 as identical to photographs that had been distributed in magazines in the late 1970s, prior to the development of virtual-imaging technology.[52]
 {¶ 73} After reviewing the admissible evidence, we hold that the state presented sufficient evidence that the performer depicted in sexual activity in State's Exhibits 7, 8, and 9 was a real minor. *Page 23 
 d. Count 15 {¶ 74} Count 15 corresponded to two video files that were presented at trial on a CD-ROM labeled State's Exhibit 14. File 2005-016.00349 depicted the anal rape of a nude infant girl. During the two-minute-and-18-second clip, the girl began crying as a man inserted his erect penis into her anus. The labia area of the infant was visible to the viewer for part of the clip. The viewer could see the force applied to restrain the infant. The motions of the man and the infant were smooth and responsive, indicating that they were real. The state was unable to identify the adult or infant in this video.
 {¶ 75} File 2005-016.00411 depicted the vaginal rape of a nude infant girl sleeping on the lap of a man sitting on a recliner chair in an infant's room. The man began by vigorously rubbing her clitoris, which was visible in the video. The infant began to wake up as the man inserted his erect penis into the infant's vagina. The infant's facial expression changed from peacefulness to great discomfort. The motions of the man and infant were smooth and responsive, indicating that they were real. The video clip lasted for one minute and three seconds. The state was unable to identify the adult or infant in this video.
 {¶ 76} Despite the lack of direct evidence to establish the use of an actual minor in the performance, we hold that the record contains sufficient evidence from which the trier of fact could have concluded that the images depicted real minors. The trier of fact could have inferred that the images were real because of the quality of the life-like images that were seamlessly displayed in a video format, as opposed to a still-image format. Kraft's own expert admitted that the creation of a similar *Page 24 
quality virtual child pornography video would have been extremely expensive and would have required an enormous amount of skill.
 {¶ 77} Also, the evidence indicated that Kraft had a habit of viewing live rapes of minors broadcast by a web camera. He required proof that the minor was real and present prior to going forward with an invitation. After viewing this evidence in the light most favorable to the state, we hold that the state proved that the images that supported count 15 depicted actual minors.
 e. Count 16 {¶ 78} Count 16 coincided with State's Exhibit 11. Stephanie Gleason, a Special Agent with the Federal Bureau of Investigation assigned to the Seattle Division, testified that in 2000 she was involved in the investigation of James and Tracy Wright for the creation of child pornography. As a result of the investigation, the Wrights had been convicted and were serving prison terms.
 {¶ 79} Gleason identified State's Exhibit 11 as one of the images recovered on the Wrights' computer during the investigation. The image showed James Wright sodomizing his two-and-a-half-year-old son, whom we refer to as D.W. Gleason testified that she recognized D.W. on the image and that D.W. was, in fact, a child whom she had held on her lap.
 {¶ 80} While testifying, Gleason was asked if she had questioned James Wright about the image. Over defense counsel's objection, she replied that she had questioned James and that he had told her that he was the adult in the image, that his son D.W. was the child in the image, and that his wife had taken the image. *Page 25 
Defense counsel objected, and the trial court overruled the objection. Kraft challenges the trial court's admission of Wright's statements on appeal.
 {¶ 81} We assume that the trial court erred in admitting the hearsay statements of Wright, where Kraft did not have an opportunity to cross-examine Wright.[53] But we hold that the error was harmless beyond a reasonable doubt. We are confident that the inadmissible statements did not contribute to the finding of guilt, where Gleason testified that she had met the minor depicted in the image.[54]
 {¶ 82} Accordingly, based upon the admissible evidence, we hold that the state presented sufficient evidence that the image supporting count 16 depicted an actual minor.
 f. Count 17 {¶ 83} Count 17 corresponded with State's Exhibit 12, a file containing an image titled "boyx06.jpg." The image showed a man performing fellatio on a boy. For this count, the state presented the deposition testimony of Brooke Donahue, a Special Agent with the Federal Bureau of Investigation's Dallas, Texas, office. Donahue testified that he recognized the individuals in Exhibit 12 from his participation in a child-pornography investigation in 2004. As a result of the investigation, he had arrested Kevin Quinn, the man depicted in the image. Quinn was subsequently convicted for creating pornography involving a minor.
 {¶ 84} Over Kraft's objection, Donahue testified about statements Quinn had made to him during the investigation. These statements included Quinn's admission that the other person in the image was his nephew, who was 10 or 11 years old at the *Page 26 
time. The trial court overruled the objection and admitted these statements into evidence. Kraft challenges the admission of these statements on appeal.
 {¶ 85} We assume that the trial court erred in admitting Quinn's hearsay statements, where Kraft did not have the opportunity to cross-examine him.[55] But we hold that the error was harmless beyond a reasonable doubt. We are confident that the inadmissible statements did not contribute to the finding of guilt, where Donahue testified from his own knowledge that Quinn was convicted of crimes requiring proof that the boy in the image was an actual minor.[56]
 {¶ 86} After reviewing the admissible evidence, we hold that the state presented sufficient evidence that the person in the image was an actual minor.
 2. Knowledge of Character of the Material {¶ 87} To establish a violation of the statute, the state was also required to prove that Kraft knew the character of the material: that it involved a real minor engaging or participating in sexual activity. The state does not need to show that the defendant had precise knowledge of the contents of the material.[57] "A person has knowledge of circumstances when he is aware that such circumstances probably exist."[58] The state may rely solely on circumstantial evidence in proving that the defendant had knowledge of the character of the material.[59]
 {¶ 88} Any circumstantial evidence that would support a finding that the image involved an actual minor would also be persuasive in demonstrating the *Page 27 
defendant's knowledge of the character of the material, including the age and actual existence of the performers. Where the title, the text, the visual representation, and other factors gleaned from the material or performance represent or depict the person as a minor, the trier of fact may infer that the person is an actual minor.[60]
 {¶ 89} Where the state has proved that an actual minor was involved, other relevant factors to show the requisite scienter include (1) the number of the images; (2) the character of any websites viewed by the defendant; (3) the defendant's method of storing the images; (4) the defendant's state of mind; and (5) the availability and expense of quality digital imaging.[61]
 {¶ 90} Kraft claims that the state failed to meet its burden for this element because it is difficult for a person to determine whether an image depicts real or virtual child pornography. Specifically, Kraft's expert in digital imaging testified that, after reviewing the images at issue, none of them could have been digitally created from a blank screen, but that he could not tell if they were the result of age-regression software or other digital manipulation.
 {¶ 91} We hold that the state presented sufficient evidence to prove that Kraft knew the character of the materials, including the age and reality of the performer, based upon the accumulation of the following evidence: the appearance of the images, including the title accompanying several of them; the large number of child-pornography images on his computer; the fact that Kraft had participated in the salacious chatroom and actively sought images of minors being abused; that Kraft had described himself in his Yahoo! profile as having "no limits"; that Kraft had admitted to masturbating while viewing child pornography on his computer because *Page 28 
it turned him on sexually; that Kraft had admitted to raping his three-year-old daughter; that the images were found on Kraft's hard drive, and that he had last viewed the files shortly before his arrest; and that the images were of a high quality and depicted nude children. The evidence demonstrating Kraft's state of mind is quite persuasive.
 3. Reproduction {¶ 92} To establish a violation of R.C. 2907.322(A)(1), the state was required to prove that Kraft had created, recorded, photographed, filmed, developed, reproduced, or published any sexually oriented material involving a minor. The state can prove that an offender reproduced such material by presenting evidence that the offender downloaded images from the Internet onto a hard drive.[62]
 {¶ 93} Officer Ruebusch, who examined Kraft's computer, testified that he found all but two of the images that served as the basis for all the charges on Kraft's hard drive in a zip file. He found the other two images, State's Exhibits 5 and 6, on Kraft's hard drive in an unallocated space for deleted files. Although Ruebusch testified that all the deleted files had been manually saved prior to deletion, he contradicted this testimony on cross-examination and stated that he could not tell if these files had been manually saved prior to deletion.
 {¶ 94} Ultimately, we hold that state presented sufficient evidence of reproduction of all the images, including the deleted files, where none of the files were found in a temporary Internet cache; Kraft's hard drive contained a large number of images; Kraft actively sought child pornography and admitted that he had *Page 29 
masturbated while viewing the material; and Kraft had recently viewed the zip file prior to his arrest.
 4. Weight of the Evidence {¶ 95} Finally, Kraft claims that his R.C. 2907.322(A)(1) convictions were against the manifest weight of the evidence. After reviewing the evidence in this case, we are confident that the trial court did not lose its way in determining what weight to give the evidence and in considering the credibility of the witnesses.[63]
 IV. Conclusion {¶ 96} In conclusion, we overrule Kraft's assignments of error and affirm his convictions for rape and pandering sexually oriented material involving a minor.
Judgment affirmed.
[1] See R.C. 2907.02(A)(1)(b).
[2] See R.C. 2907.322(A)(2) and 2907.322 (A)(4).
[3] See R.C. 2907.322(A)(1).
[4] R.C. 2907.01(A).
[5] State v. Edwards (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph one of the syllabus.
[6] Id.
[7] Id. at 35-36, citing State v. Maranda (1916), 94 Ohio St. 364, 114 N.E. 1038.
[8] State v. Marshall, 5th Dist. No. 2005CA00052, 2006-Ohio-83, at 19 (internal citation omitted).
[9] Id., citing State v. Black (1978), 54 Ohio St.2d 304, 307,376 N.E.2d 948.
[10] Id., citing State v. Nicely (1988), 39 Ohio St.3d 147, 152,529 N.E.2d 1236.
[11] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[12] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[13] Ashcroft v. Free Speech Coalition (2002), 535 U.S. 234, 255,122 S.Ct. 1389.
[14] Grayned v. City of Rockford (1972), 408 U.S. 104, 108-109,92 S.Ct. 2294.
[15] Id.
[16] See State v. Huffman, 165 Ohio App.3d 518, 2006-Ohio-1106,847 N.E.2d 58, at 12, appeal accepted and cause held for the decision in State v. Tooley, 2006-0216 and 2006-0105.
[17] See id., citing State v. Anderson (1991), 57 Ohio St.3d 168, 171,566 N.E.2d 1224.
[18] See New York v. Ferber (1982), 458 U.S. 747, 759-761,102 S.Ct. 3348; Osborne v. Ohio (1990), 495 U.S. 103, 110-111, 110 S.Ct. 1691.
[19] Ashcroft, 535 U.S. 234.
[20] Id. at 241.
[21] Id. at 256.
[22] Id. at 241-242, 256.
[23] R.C. 2907.322.
[24] R.C. 2907.322(B)(3).
[25] Huffman, 2006-Ohio-1106, at 22-29.
[26] Id. at 26.
[27] Id. at 28.
[28] 9th Dist. No. 04CA0036, 2005-Ohio-599.
[29] See, e.g., United States v. Farrelly (C.A.6, 2004), 389 F.3d 649,653-655, abrogated on other grounds by United States v.Williams (C.A.6, 2005), 411 F.3d 675, 678, fn.1; United States v.Rodriguez-Pacheco (C.A.1, 2007), 475 F.3d 434, 440-445; United States v.Slanina (C.A.5, 2004), 359 F.3d 356, 357.
[30] 11th Dist. No. 2004-P-0064, 2005-Ohio-6709, appeal granted in 2006-0105 and conflict certified in 2006-0216.
[31] Huffman, 2006-Ohio-1106, at 31.
[32] See id. at 33.
[33] R.C. 2907.322(A).
[34] See State v. Maxwell, 95 Ohio St.3d 254, 2002-Ohio-2121,767 N.E.2d 242, at 32.
[35] United States v. X-Citement Video, Inc. (1994), 513 U.S. 64, 73,115 S.Ct. 464.
[36] Mishkin v. New York (1966), 383 U.S. 502, 512, 86 S.Ct. 958. See, also, X-Citement Video, 513 U.S. at 64.
[37] See X-Citement Video, 513 U.S. at 78; Smith v.California (1959), 361 U.S. 147, 80 S.Ct. 215.
[38] Boyce Motor Lines, Inc. v. United States (1952), 342 U.S. 337, 340,72 S.Ct. 329.
[39] See Jenks, 61 Ohio St.3d 259, paragraph two of the syllabus.
[40] Id.
[41] See Thompkins, 78 Ohio St.3d at 387.
[42] R.C. 2907.322(A)(1).
[43] See Jenks, 61 Ohio St.3d 259, paragraph two of the syllabus.
[44] Huffman, 2006-Ohio-1106, at 51.
[45] See id.; R.C. 2907.322(B)(3).
[46] See Crawford v. Washington (2004), 541 U.S. 36, 53-54,124 S.Ct. 1354.
[47] See United States v. Summers (C.A.10, 2005),414 F.3d 1287, 1303.
[48] Id.
[49] See Chapman v. California (1967), 386 U.S. 18, 23,87 S.Ct. 824.
[50] See Delaware v. Van Arsdall (1986), 475 U.S. 673, 684,106 S.Ct. 1431.
[51] See Crawford, 541 U.S. at 53-54.
[52] See Van Arsdall, 475 U.S. at 684.
[53] See Crawford, 541 U.S. at 53-54.
[54] See Van Arsdall, 475 U.S. at 684.
[55] See Crawford, 541 U.S. at 53-54.
[56] See Van Arsdall, 475 U.S. at 684.
[57] See, generally, State v. Burgin (1978), 56 Ohio St.2d 354, 363-364,384 N.E.2d 255.
[58] R.C. 2901.22(B).
[59] See Burgin, 56 Ohio St.2d at 364.
[60] See R.C. 2907.322(B)(3).
[61] See State v. Marchand (D.C.N.J. 2004), 308 F.Supp.2d 498, 505.
[62] Huffman, 2006-Ohio-1106, at 49.
[63] See Thompkins, 78 Ohio St.3d at 387.
 SUNDERMANN, J., concurs.
PAINTER, P.J., concurs separately.